**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**SANCTUARY CARE LLC AND SANCTUARY AT RYE OPERATIONS LLC**

**COLLECTIVELY, AS "SELLER"**

**AND**

**NBR ACQUISITION RYE, LLC**

**AS "BUYER"**

110855143.8

## Table of Contents

**Page**

ARTICLE 1: DEFINITIONS ...............................................................................................1
    1.1.    Definitions ............................................................................................1
ARTICLE 2: CONSIDERATION, DEPOSIT AND ESCROW PROVISIONS...........................1
    2.1.    Purchase Price .......................................................................................1
    2.2.    Deposit; Escrow Agent ..........................................................................2
    2.3.    Escrow Provisions .................................................................................2
    2.4.    Payment of Monies ...............................................................................3
ARTICLE 3: ACCESS; INSPECTIONS.................................................................................3
    3.1.    Seller's Delivery of Specified Documents .................................................3
    3.2.    Access and Inspection Rights .................................................................4
    3.3.    Title and Survey Review .......................................................................4
    3.4.    Service Contracts .................................................................................5
    3.5.    Employees ...........................................................................................5
    3.6.    CCRs ..................................................................................................6
ARTICLE 4: OPERATIONS; RISK OF LOSS; LICENSING ...................................................6
    4.1.    Ongoing Operations ..............................................................................6
    4.2.    Damage ...............................................................................................8
    4.3.    Condemnation ......................................................................................8
ARTICLE 5: CLOSING .....................................................................................................9
    5.1.    Sale Motion.........................................................................................9
    5.2.    Closing .............................................................................................10
    5.3.    Conditions to the Parties' Obligations to Close.......................................10
    5.4.    Seller's Deliveries ..............................................................................13
    5.5.    Buyer's Deliveries .............................................................................14
    5.6.    Possession .........................................................................................15
    5.7.    Delivery of Books and Records .............................................................15
ARTICLE 6: PRORATIONS; COSTS; ADJUSTMENTS .......................................................15
    6.1.    Prorations..........................................................................................15
    6.2.    Utilities ............................................................................................16
    6.3.    Service Contracts ...............................................................................17

110855143.8

| | | |
|---|---|---|
| 6.4. | Accrued Employee Benefits | 17 |
| 6.5. | Sales, Transfer, and Documentary Taxes; Closing Costs | 17 |
| 6.6. | Liabilities. | 17 |
| 6.7. | No Other Obligations | 18 |
| 6.8. | Adjustment Procedure.. | 18 |

**ARTICLE 7: REPRESENTATIONS AND WARRANTIES** ...... 18

| | | |
|---|---|---|
| 7.1. | Seller's Representations and Warranties | 18 |
| 7.2. | Buyer's Representations and Warranties | 24 |
| 7.3. | Intentionally Omitted | 25 |
| 7.4. | Survival of Representations and Warranties | 25 |

**ARTICLE 8: DEFAULT AND REMEDIES** ...... 25

| | | |
|---|---|---|
| 8.1. | Buyer's Remedies | 25 |
| 8.2. | Seller's Remedies | 25 |
| 8.3. | Other Expenses | 25 |
| 8.4. | Termination | 25 |
| 8.5. | Break-Up Fee | 27 |

**ARTICLE 9: NON SOLICITATION; NON COMPETE** ...... 27

| | | |
|---|---|---|
| 9.1. | Non-Solicitation | 27 |
| 9.2. | Non-Compete | 27 |
| 9.3. | Enforcement | 28 |

**ARTICLE 10: MISCELLANEOUS** ...... 28

| | | |
|---|---|---|
| 10.1. | Parties Bound | 28 |
| 10.2. | Headings | 28 |
| 10.3. | Invalidity and Waiver | 28 |
| 10.4. | Governing Law | 28 |
| 10.5. | Survival | 29 |
| 10.6. | No Third Party Beneficiary | 29 |
| 10.7. | Entirety and Amendments | 29 |
| 10.8. | Time | 29 |
| 10.9. | Notices | 29 |
| 10.10. | Construction | 29 |
| 10.11. | Calculation of Time Periods | 29 |
| 10.12. | Execution in Counterparts | 29 |
| 10.13. | Further Assurances | 30 |

110855143.8

10.14.  Waiver of Jury Trial......................................................................................30

10.15.  Bulk Sales................................................................................................30

10.16.  Release. .................................................................................................30

10.17.  Additional Bankruptcy Provisions.......................................................................30

110855143.8

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is made as of March 8, 2017, by and among SANCTUARY CARE LLC, a New Hampshire limited liability company, and SANCTUARY AT RYE OPERATIONS LLC, a New Hampshire limited liability company (collectively, "Seller"), and NBR ACQUISITION RYE, LLC, a Delaware limited liability company ("Buyer").

## R E C I T A L S

A.      Seller owns the Assets which include the Senior Housing Facility described on Exhibit B attached hereto; and

B.      Seller desires to sell and Buyer desires to purchase the Assets upon and subject to the terms and conditions set forth herein.

## A G R E E M E N T

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller hereby agrees to sell and Buyer hereby agrees to purchase the Assets upon and subject to the following terms and conditions:

## ARTICLE 1:  DEFINITIONS

1.1.     Definitions.  Initially capitalized terms which are used but not otherwise defined in this Agreement shall have the meanings ascribed to them in Exhibit A attached hereto and incorporated herein by this reference.

## ARTICLE 2:  CONSIDERATION, DEPOSIT AND ESCROW PROVISIONS

2.1.     Purchase Price.  The Purchase Price, subject to the prorations and adjustments set forth herein, shall be paid as follows:

(a)      Within two (2) business days after the execution and delivery of this Agreement, Buyer shall deliver to Escrow Agent, in immediately available funds, a cash deposit in the amount of One Hundred Thousand and 00/100 Dollars ($100,000.00) (the "Initial Deposit").  The Deposit is not property of any bankruptcy estate.  Within one (1) business day after the final day of the Due Diligence Period, unless Buyer has exercised its right to terminate this Agreement under Section 3.2 hereof, Buyer shall deliver to Escrow Agent, in immediately available funds, an additional cash deposit in the amount of One Hundred Thousand and 00/100 Dollars ($100,000.00) (such additional deposit, together with the Initial Deposit with all interest earned on any such deposited funds, shall hereinafter be referred to collectively as the "Deposit").  The Deposit shall not be subject to any lien, attachment, trustee process, or any other judicial process of any creditor of Seller or Buyer. Interest accrued on the Deposit shall become a part of the Deposit and shall be paid to the party entitled to the Deposit. The Deposit shall be credited to the Purchase Price if the Closing occurs, and otherwise distributed pursuant to this Agreement;

(b)      The balance of the Purchase Price shall be paid by wire transfer in same day funds  at the time of Closing.

Notwithstanding the foregoing:

(1)      if this Agreement is terminated by Buyer as a matter of right in accordance with the terms of this Agreement, then the Deposit, together with all accrued investment income or interest thereon, shall be returned to Buyer within two (2) business days immediately upon termination shall be Buyer's sole and exclusive remedy for any damages of any kind that Buyer may suffer as a result of the Closing not being consummated with Buyer in accordance with this Agreement.

Unless this Agreement has been validly terminated in accordance with its terms (in which case Section 2.1(1) or (8.2) shall control), in the event that Buyer is not the Successful Bidder following the Auction, the Escrow Agent shall return the Deposit to Buyer no later than two (2) business days after the entry of the Sale Order by the Bankruptcy Court with respect to the Alternative Transaction involving the Successful Bidder.  Notwithstanding any provision of this Section 2.1, nothing in this Section 2.1 shall be deemed to release any party from liability for fraud or willful misconduct.

2.2.      Deposit; Escrow Agent.

(a)      Upon receipt from Buyer of the Deposit, Escrow Agent shall invest the Deposit in an interest-bearing account or money market fund mutually acceptable to Seller and Buyer.  Escrow Agent shall agree to hold and dispose of the Deposit in accordance with the terms and provisions of this Agreement.  If the Closing occurs, any interest on the Deposit shall be credited to Buyer and applied to the Purchase Price.  If the Closing does not occur, any interest earned on the Deposit shall follow the Deposit.

(b)      The parties hereto do hereby certify that they are aware that the Federal Deposit Insurance Corporation ("FDIC") coverages may apply only to a cumulative maximum amount of $250,000 for each individual deposit for all of depositor's accounts at the same or related institution.  The parties hereto further understand that certain banking instruments such as, but not limited to, repurchase agreements and letters of credit are not covered at all by FDIC insurance.  Further the parties hereto understand that Escrow Agent assumes no responsibility for, nor will the parties hereto hold Escrow Agent liable for, any loss occurring which arises from the fact that the amount of the above account may cause the aggregate amount of any individual depositor's accounts to exceed $250,000 and that the excess amount is not insured by the Federal Deposit Insurance Corporation or that FDIC insurance is not available on certain types of bank instruments.

2.3.      Escrow Provisions.  Escrow Agent agrees to hold, keep and deliver the Deposit and all other sums delivered to it pursuant hereto in accordance with the terms and provisions of this Agreement.  Escrow Agent shall not be entitled to any fees or compensation for its services hereunder other than its customary one-time escrow fee.  Escrow Agent shall be liable only to hold said sums and deliver the same to the parties named herein in accordance with the provisions of this Agreement, it being expressly understood that by acceptance of this Agreement Escrow Agent is acting in the capacity of a depository only and shall not be liable or responsible

2

to anyone for any damages, losses or expenses unless same shall have been caused by the gross negligence or willful malfeasance of Escrow Agent. In the event of any disagreement between Buyer and Seller resulting in any adverse claims and demands being made in connection with or for the monies involved herein or affected hereby, Escrow Agent shall be entitled to refuse to comply with any such claims or demands so long as such disagreement may continue; and in so refusing Escrow Agent shall make no delivery or other disposition of any of the monies then held by it under the terms of this Agreement, and in so doing Escrow Agent shall not become liable to anyone for such refusal; and Escrow Agent shall be entitled to continue to refrain from acting until (a) the rights of the adverse claimants shall have been finally adjudicated in a court of competent jurisdiction of the monies involved herein or affected hereby, or (b) all differences shall have been adjusted by agreement between Seller and Buyer, and Escrow Agent shall have been notified in writing of such agreement signed by the parties hereto. Escrow Agent shall not be required to disburse any of the monies held by it under this Agreement unless in accordance with either a joint written instruction of Buyer and Seller or an Escrow Demand from either Buyer or Seller in accordance with the provisions hereinafter. Upon receipt by Escrow Agent from either Buyer or Seller (the "Notifying Party") of any notice or request (an "Escrow Demand") to perform any act or disburse any portion of the monies held by Escrow Agent under the terms of this Agreement, Escrow Agent shall give written notice to the other party (the "Notified Party"). If within five (5) days after the giving of such notice, Escrow Agent does not receive any written objection to the Escrow Demand from the Notified Party, Escrow Agent shall comply with the Escrow Demand. If Escrow Agent does receive written objection from the Notified Party in a timely manner, Escrow Agent shall take no further action until the dispute between the parties has been resolved pursuant to either clause (a) or (b) above. Further Escrow Agent shall have the right at all times to pay all sums held by it (i) to the appropriate party under the terms hereof, or (ii) into any court of competent jurisdiction after a dispute between or among the parties hereto has arisen, whereupon Escrow Agent's obligations hereunder shall terminate. Seller and Buyer, jointly and severally agree to indemnify and hold harmless said Escrow Agent from any and all costs, damages and expenses, including reasonable attorneys' fees, that said Escrow Agent may incur in compliance with and in good faith in accordance with the terms of this Agreement; provided, however, this indemnity shall not extend to any act of gross negligence or willful malfeasance on the part of the Escrow Agent.

2.4.    Payment of Monies. Any monies payable under this Agreement, unless otherwise specified in this Agreement, shall be paid by wire transfer or certified or cashier's check.

## ARTICLE 3:  ACCESS; INSPECTIONS

3.1.    Seller's Delivery of Specified Documents. To the extent previously requested but not already delivered to Buyer, within three (3) days after the execution and delivery of this Agreement, Seller shall deliver to Buyer true, correct and complete originals or copies of each item described in Exhibit G attached hereto (the "Seller Deliverables") in Seller's possession or control. To the extent not previously requested, within five (5) days after the written request from Buyer to Seller, Seller shall deliver to Buyer true, correct and complete originals or copies of each Seller Deliverable in Seller's possession or control. To the extent any of the Seller Deliverables contain individually identifiable health information regarding the Seller's patients, the Buyer agrees to treat same as Protected Health Information under the Health Insurance Portability and Accountability Act of 1996 (HIPAA).

110855143.8

3.2.    Access and Inspection Rights.    Buyer and its agents, employees and representatives, contractors and consultants shall at any time, and from time to time, between the Effective Date and the Closing Date, have reasonable access during normal business hours to the Facility and all books and records for the Facility that are in Seller's possession or control for the purpose of conducting surveys, inspections, tests and studies, including, without limitation, engineering, geotechnical and environmental inspections and tests.    In the course of its investigation of the Assets, Buyer may make inquiries to third parties, including, without limitation, lenders, contractors, parties to Service Contracts and municipal, local and other government officials and representatives.    Seller shall cooperate with Buyer's due diligence during normal business hours so long as Buyer gives at least twenty-four (24) hours' notice to Seller, conducts such due diligence during normal business hours and is not disruptive to the operation of Seller's business at the Facility.    If Buyer is not satisfied in its sole discretion with any of survey, inspection, test or study or with any other matter concerning the Assets, or for no reason, Buyer may terminate this Agreement by written notice given to Seller on before the date of expiration of the Due Diligence Period, in which event this Agreement shall be null and void and no party shall have any further obligation hereunder, except as specifically set forth herein. Without limiting the foregoing, unless Buyer shall give written notice to Seller on or before the expiration of the Due Diligence Period that Buyer has waived its right to terminate this Agreement as aforesaid, Buyer shall be deemed to have elected to terminate this Agreement under this Section 3.2, in which event the Agreement shall be null and void and no party shall have any further obligation hereunder, except as expressly set forth herein.    For purposes of clarity, Buyer may terminate this Agreement for any reason, or no reason, prior to the expiration of the Due Diligence Period, in which case the Deposit, and interest thereon, shall be promptly returned to Buyer.

3.3.    Title and Survey Review.

(a)    Buyer shall have the right to obtain a title commitment for owner's title insurance policy (the "Title Commitment") and survey of the Real Property (the "Survey"). Buyer shall give notice to Seller of any objection to any exception or other matter shown in the Title Commitment or Survey on or before the date of expiration of the Due Diligence Period. If Buyer makes any such written objection, then Seller shall use best efforts to cure such objection prior to Closing.  Without limiting the foregoing, Seller shall be obligated to fully discharge on or before Closing (i) all mortgages, security interests and other monetary liens and encumbrances of a definite and ascertainable amount (each a "Monetary Lien"), and (ii) any exceptions or encumbrances to title or survey matters which arise after the date of the Title Commitment or the Survey.  If Buyer fails to give written notice to Seller of any objection to title or survey within the Due Diligence Period, then Buyer shall be deemed to have approved the state of title and survey, except for Monetary Liens and any matters which arise after the date of the Title Commitment or Survey. Notwithstanding anything to the contrary set forth in this Section 3.3 (a), entry of the Sale Order shall satisfy Seller's obligation to remove all Monetary Liens as long as the effectiveness of the Sale Order is not stayed.

(b)    If Seller fails to cure an objection to title or survey in the manner set forth above, then Buyer may elect, on or prior to the Closing Date, to (i) terminate this Agreement, in which event the Deposit and all interest earned thereon shall be returned to Buyer and no party shall have any further obligations hereunder, except as specifically set forth herein, or (ii) accept

4

the Assets subject to such objections and proceed to Closing, with the further right to deduct from the Purchase Price amounts secured by any Monetary Lien which Seller has failed to remove as provided herein.  If Buyer makes no such election, then Buyer shall be deemed to have elected to waive its right to terminate this Agreement as provided above in this Section 3.3(b).

3.4.    Service Contracts.  Prior to the expiration of the Due Diligence Period, Buyer shall notify Seller in writing as to which Service Contracts, if any, Buyer may assume. The Sale Motion shall include a procedure to establish any cure obligations required under 11 U.S.C. 365 to permit an assumption and assignment of the Service Contracts identified by the Buyer. Buyer is responsible for any such cure obligations, monetary or otherwise.  The cure amounts set forth in the Sale Order shall be binding on all counterparties to the Service Contracts.   Buyer shall notify Seller of which Service Contracts it shall assume (the "Accepted Service Contracts") by giving written notice of its intention to assume the Service Contract five (5) days prior to the Closing Date.  If Buyer does not identify a Service Contract for assumption five (5) days prior to the Closing Date, then Buyer shall be deemed to have elected to not assume such Service Contract.  The Sale Order shall provide that the Assets shall be transferred free and clear of all Service Contracts that Buyer does not elect to assume as aforesaid (the "Excluded Service Contracts"), with any and all termination expenses and costs therefor to be the responsibility of Seller.

3.5.    Employees.

(a)    On the Closing Date, Seller shall terminate all Employees and take such other action as may be required by any applicable laws, rules, regulations and orders such that Buyer shall have no liability for any matter concerning any Employee which accrued prior to Closing except for accrued vacation and other accrued paid time off and benefits ("Accrued Employee Benefits") related to any Employee hired by Buyer at Closing with respect to which Buyer receives a credit in accordance with the provisions of Section 6.4 hereof.  Except for any Accrued Employee Benefits for which Buyer receives a credit at Closing as aforesaid, Buyer is assuming no liability attributable to any Employee which accrued prior to Closing.  Seller shall be solely liable to pay to its Employees all severance and Accrued Employee Benefits to which the Employees are entitled through the Closing Date, except for any Accrued Employee Benefits for which Buyer receives a credit at Closing as aforesaid.  Seller shall indemnify, defend and hold Buyer and its assigns from and against any and all losses, damages, costs and expenses, including, without limitation, attorneys' fees and costs, arising from any claim made by any Employee relating to matters occurring prior to Closing, except for any claim by any Employee hired by Buyer for Accrued Employee Benefits for which Buyer receives a credit at Closing as aforesaid.

(b)    Notwithstanding any provision hereof to the contrary, at any time during the term of this Agreement, Buyer may discuss employment arrangements with any Employee and may make offers of employment to any Employee contingent upon Closing occurring hereunder and otherwise upon such terms and conditions of employment, compensation and benefits as Buyer shall determine in its sole discretion.  Seller hereby consents to the hiring of any Employee by Buyer upon Closing and waives, with respect to the employment by Buyer of any Employee, any claims or rights that Seller may have against Buyer or any Employee under

any non-competition, confidentiality or employment agreement. Seller shall cooperate with Buyer's process of interviewing the Employees.

3.6.  CCRs.  If the Assets are subject to any declaration of covenants, conditions and restrictions or similar instrument ("CCRs") governing or affecting the use, operation, maintenance, management or improvement of the Assets, then, as a condition to Buyer's obligation to close, Seller shall deliver at Closing: (i) an estoppel certificate, in form and substance reasonably satisfactory to Buyer, from the declarant, association, committee, agent and/or other person or entity having governing or approval rights under the CCRs, and (ii) a recordable assignment, in form and substance satisfactory to Buyer, assigning any and all developer, declarant or other related rights or interests of Seller (or any Affiliate of Seller) (if any) pursuant to any CCR.

## ARTICLE 4:  OPERATIONS; RISK OF LOSS; LICENSING

4.1.  Ongoing Operations.  From the Effective Date through the Closing Date:

(a)  Operation of Assets; Construction.  Seller shall continue to own the Assets and to operate the Facility (or cause the Facility to be operated) as it has in the past and shall not engage in any transactions outside the ordinary course of business.  Seller shall maintain the Facility (or cause the Facility to be maintained) in substantially its current condition and in compliance with all applicable laws, regulations and Permits.  Except as necessary to comply with the preceding sentence, Seller shall not make (or suffer or permit to be made) any renovations, alterations, or capital expenditures to the Facility or any portion thereof costing more than $10,000, individually or in the aggregate, or enter into any contracts or agreements (whether binding or not) regarding any such renovations, alterations, or capital expenditures. Seller will perform (or cause to be performed) all of the obligations of Seller under the Residency Agreements, the Leases, the Service Contracts and all other agreements that may affect the Facility.

(b)  Listings and Other Offers.

(i)  Between the date of this Agreement and the Bankruptcy Court's entry of the Bidding Procedures Order (the "Non-Solicitation Period"), Seller shall not, nor shall it authorize or permit any officer, director, manager, or employee of, or any investment banker, attorney or other advisor, agent, or representative of, Seller or any Affiliate or Non-Debtor Subsidiary (collectively, "Seller Representatives"), enter into an Alternative Transaction or negotiate the terms of an Alternative Transaction; provided, however, that during the Non-Solicitation Period, so long as Seller is not otherwise in breach of this Agreement, nothing in this Agreement shall prohibit Seller or Seller Representatives from entering into confidentiality agreements with any entity or furnishing to any entity any information relating to the Assets with respect to any proposal or expression of interest that constitutes, or which may lead to, a Qualified Bid; and provided further, however, that Seller shall not execute any Alternative Transaction prior to the Bankruptcy Court's entry of the Bidding Procedures Order.

(ii)  Following entry of the Bidding Procedures Order, Seller and Seller Representatives shall not be subject to any restrictions with respect to the solicitation or

6

encouragement of any entity concerning the potential or actual submission of a Qualified Bid in accordance with the Bidding Procedures Order.

(iii)    Within twenty-four (24) hours after Seller's receipt of any offer for an Alternative Transaction, Seller must deliver to Buyer, in writing, true and complete copies of any such Alternative Transaction.

(c)    <u>Removal and Replacement of Tangible Personal Property; Transfer or Conveyance of Other Property</u>.  Seller will not remove or suffer or permit to be removed any Personal Property from the Facility except as may be required for necessary repair or replacement in the ordinary course of business.  Without limiting the foregoing, all repairs and replacements shall be of equivalent quality and quantity as existed as of the time of removal of the applicable Personal Property.  Except as permitted by the preceding sentence, Seller shall not make (or suffer or permit to be made) any transfers or conveyances of the Assets.

(d)    <u>Maintenance of Insurance</u>.  Seller shall carry worker's compensation, commercial general liability insurance (with coverage in the amount of at least $1 million per occurrence and in the aggregate) and property damage insurance for the full replacement value of the Improvements through the Closing Date.  Seller shall not allow any breach, default, termination or cancellation of any such insurance policies or agreements to occur or exist prior to Closing.

(e)    <u>Maintenance of Permits</u>.  Seller shall maintain (or cause to be maintained) in existence all Permits in full force and effect.

(f)    <u>Employee Hiring/Compensation</u>.  Seller shall not hire any new employee, increase the compensation or benefits of any Employee or enter into any contracts or agreements (whether binding or not) regarding any increase of the compensation or benefits of any Employee except in the ordinary course of business.

(g)    <u>Incurrence of Indebtedness</u>.  Seller shall not incur any indebtedness or other liabilities other than in the ordinary course of business and consistent with past practices or enter into any contracts or agreements (whether binding or not) regarding the incurrence of any such indebtedness or other liabilities.  Buyer acknowledges that Seller will seek Court approval of Debtor-in-Possession financing during the course of Seller's Chapter 11 proceeding.

(h)    <u>Conditions of Units</u>.  On the Closing Date, all senior housing units on the Assets which were vacant on the date fourteen (14) days before the Closing Date shall be clean, have been repainted, if necessary, have appliances in good working order, have carpeting replaced if necessary, and be otherwise "rent ready", all in accordance with Seller's past practices.

(i)    <u>Approvals</u>.  Seller shall work diligently and cooperate with Buyer to obtain all waivers, consents, approvals and authorizations required in connection with the transactions contemplated hereunder, including without limitation all licenses and approvals required by governmental agencies charged with regulating or licensing senior housing facilities.

110855143.8

(j)     Operating Statements and Occupancy Reports.   Seller shall deliver to Buyer copies of the monthly interim Operating Statements and Rent Roll for the Facility within fifteen (15) days after the expiration of each month, commencing with [February 1], 2017.  Seller shall deliver weekly occupancy reports for the Facility on or before Wednesday of each week during the term hereof (covering occupancy for the prior week).

(k)     Agreements to Effect Prohibited Actions.   Seller will not enter into any contracts or agreements (whether binding or not) regarding any of the matters prohibited by paragraphs above.

4.2.    Damage.   Risk of loss with respect to the Real Property up to and including the Closing Date shall be borne by Seller.  Seller shall promptly give Buyer written notice of any damage to the Facility, describing such damage, stating whether such damage and loss of rents is covered by insurance and the estimated cost of repairing such damage.  In the event of any material damage (described below) to or destruction of the Facility or any portion thereof, Buyer may, at its option, by notice to Seller given within ten (10) business days after Seller has provided the above described notice to Buyer together with all relevant information concerning the nature and extent of such damage: (i) terminate this Agreement, in which event the Deposit and all interest earned thereon shall be returned to Buyer and no party shall have any further obligations hereunder, except as expressly set forth herein, or (ii) proceed under this Agreement as to all of the Assets, receive any insurance proceeds (including any rent loss insurance applicable to any period on and after the Closing Date) due Seller as a result of such damage or destruction and assume responsibility for such repair, and Buyer shall receive a credit at Closing for any deductible, uninsured or coinsured amount under said insurance policies.  If Buyer fails to timely make such election, Buyer shall be deemed to have elected to proceed under clause (ii) above.  If the Facility is not materially damaged, then (A) Buyer shall not have the right to terminate this Agreement, (B) Seller shall, to the extent requested and directed by Buyer, repair the damage before the Closing in a manner reasonably satisfactory to Buyer, and (C) at Closing, Buyer shall receive any insurance proceeds (including any rent loss insurance applicable to any period on and after the Closing Date) due Seller as a result of such damage or destruction and Buyer shall receive a credit at Closing for any deductible, uninsured or co-insured amount under said insurance policies.  To the extent Seller has incurred reasonable costs in effecting the repairs requested and directed in writing by Buyer (which costs have not been assumed by Buyer), Seller shall be paid a portion of such insurance proceeds in an amount equal to such costs.  "Material damage" and "materially damaged" means, with respect to the Facility, damage (x) which, in Buyer's reasonable estimation, exceeds $150,000 to repair, or (y) which, in Buyer's reasonable estimation, will take longer than sixty (60) days to repair or restore.

4.3.    Condemnation.    In the event any proceedings in eminent domain are contemplated, threatened or instituted by anybody having the power of eminent domain with respect to the Real Property or any portion thereof, Buyer may, at its option, by notice to Seller given within ten (10) business days after Seller provides written notice to Buyer of such proceedings together with all relevant information concerning such proceedings: (i) terminate this Agreement, in which event the Deposit and all interest earned thereon shall be returned to Buyer and no party shall have any further obligations thereunder, except as expressly set forth herein, or (ii) proceed under this Agreement as to all of the Assets, in which event Seller shall, at the Closing, assign to Buyer its entire right, title and interest in and to any condemnation award,

and Buyer shall have the sole right during the pendency of this Agreement to negotiate and otherwise deal with the condemning authority in respect of such matter. If Buyer fails to timely make such election, Buyer shall be deemed to have elected to proceed under clause (ii) above.

## ARTICLE 5: <u>CLOSING</u>

5.1.    Sale Motion.

(a)    Within five (5) days following expiration of the Due Diligence Period, Seller shall file original petitions for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

(b)    Seller hereby agrees to file, and not withdraw without Buyer's consent, the Sale Motion and the Bid Procedures Motion promptly following the Due Diligence Period (and in no event later than five (5) days thereafter) seeking (i) entry by the Bankruptcy Court of the Bidding Procedures Order and (ii) Bankruptcy Court approval of this Agreement and the transactions contemplated hereby, subject to higher or otherwise better offers. Such Sale Motion and Bid Procedures Motion shall be subject to Buyer's prior reasonable approval.

(c)    Seller shall seek a hearing on the Bid Procedures Motion on an emergency basis at the Bankruptcy Court's earliest availability, and obtain an order approving bid procedures reasonably acceptable to Seller and Buyer no later than ten (10) days after the filing date of the Bid Procedures Motion.

(d)    During the pendency of the Bankruptcy Court proceedings, Seller shall be permitted to use the names "*Sanctuary Care LLC*" and "*Sanctuary at Rye Operations LLC*" as its corporate names in connection with matters relating to the Bankruptcy Case and as a former name for legal and noticing purposes but for no other commercial purpose. After the Closing, Seller shall conduct no further commercial activity using the names "*Sanctuary Care*" and "*Sanctuary at Rye*" or any derivatives thereof.

(e)    The Bid Procedures Motion shall seek to schedule the Auction and Sale Hearing under section 363 and 365 of the Bankruptcy Code to occur no later than thirty (30) days after the approval of the Bid Procedures Order. The Bid Procedures Motion and the Sale Motion shall seek a waiver of the 14-day stay of the Bidding Procedures Order and the Sale Order imposed by Bankruptcy Rule 6004.

(f)    Any changes to the form of the Sale Order affecting the economic terms of the transactions contemplated by this Agreement or the closing conditions hereof must be approved by Buyer in its sole and absolute discretion and Seller in its sole and absolute discretion. Any other changes to the form of the Sale Order must be approved by Buyer and Seller each acting reasonably.

(g)    Except as otherwise set forth in this Agreement to the contrary with respect to the any purchase price adjustment amounts set forth in Article 6, the Bankruptcy Court retains exclusive jurisdiction to interpret and enforce the provisions of this Agreement, the Bidding Procedures Order, and the Sale Order in all respects; provided, however, that in the event the Bankruptcy Court abstains from exercising or declines to exercise jurisdiction with

110855143.8

respect to any matter provided for in this clause or is without jurisdiction, such abstention, refusal or lack of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction of any other court having competent jurisdiction with respect to any such matter.

(h)     In the event the Sale Order is appealed and is not stayed, Buyer and Seller shall close on the purchase and sale of the Assets in accordance with the terms of this Agreement and the Sale Order and Seller shall use its best efforts to defend such appeal following Closing. Seller shall keep Buyer reasonably informed of the status of its efforts to obtain the entry of the Sale Order. Buyer shall reasonably cooperate with Seller in connection with the foregoing, at no cost or expense to Buyer.

5.2.     Closing.  Upon the Bankruptcy Court's approval of the terms and conditions of this Agreement and the entry of the Sale Order approving the Buyer, and subject to the Conditions Precedent, the consummation of the transactions contemplated herein (the "Closing") shall occur on or before the later of: (1) seven (7) business days following the entry of the Sale Order or (2) the third (3rd) business day following the satisfaction of the Conditions Precedent. Notwithstanding the foregoing, if the Closing does not occur on or before June 15, 2017,  either party may immediately terminate this Agreement, in which case the Deposit shall be returned to Buyer within two (2) business days pursuant to this Agreement; provided, however, that Buyer may, in its sole discretion, elect, by written notice given to Seller on or before June 15, 2017, along with a payment in the amount of Seventy-Five Thousand and 00/100 Dollars ($75,000.00) (the "Extension Payment") to extend the time to close for thirty (30) days.  Such Extension Payment shall be used by the Seller to cover a portion of the operating costs during the thirty (30) day window, shall be treated as an increase of the Purchase Price and shall be applied to the Purchase Price at Closing.  If the Closing does not occur within such additional thirty (30) day window, either party may immediately terminate this Agreement, in which case the Deposit shall be returned to Buyer within two (2) business days pursuant to this Agreement.  The date of Closing shall be referred to herein as the "Closing Date."  The Closing shall be effectuated through an escrow with the Escrow Agent.  Buyer and Seller shall execute such supplemental escrow instructions as may be reasonably requested by either party or Escrow Agent to comply with the terms of this Agreement, so long as such instructions are not in conflict with this Agreement.

5.3.     Conditions to the Parties' Obligations to Close (collectively, the "Conditions Precedent").

(a)     Conditions to Buyer's Obligation to Close.  As a condition to Buyer's obligation to close with respect to the Assets on the Closing Date:

(i)     The Bankruptcy Court:

(1)     Shall have entered the Sale Order and the Sale Order shall not be stayed;

(2)     The Sale Order shall approve this Agreement and the consummation of the Transaction upon the terms and subject to the conditions set forth in this Agreement;

(3)     The Sale Order finds that, as of the Closing Date, the transactions contemplated by this Agreement effect a valid, legal, enforceable, and effective sale and transfers of the Assets to Buyer and shall vest Buyer with title to such Assets free and clear of all Encumbrances.  For purposes of clarity, the Sale Order shall provide that Buyer is acquiring the Assets free and clear of Seller's Experience Modification Rate;

(4)     The Sale Order finds that the consideration provided by the Buyer pursuant to this Agreement constitutes reasonably equivalent value and fair consideration for the Assets;

(5)     The Sale Order authorizes the Sellers' to assign any Accepted Service Contracts, finds that such assignments to the Buyer are effective as of the Closing Date, and expressly enjoins the parties to each such Accepted Service Contracts from asserting against Buyer or any of the Assets any default, claim, liability, or other cause of action existing as of the Closing Date, whether or not previously asserted;

(6)     The Sale Order finds that the Buyer is a good faith purchaser subject to the protections of Section 363(m) of the Bankruptcy Code and that the transaction was negotiated at arms' length, was not the product of collusion, and is not avoidable pursuant to Section 363(n); provided, however, that if any party in interest objects to the Bankruptcy Court's Section 363(m) finding at the sale hearing, then the Sale Order must also be a Final Order;

(7)     The Sale Order finds that the Seller gave due and proper notice of the Sale Motion to each party entitled thereto;

(8)     The Sale Order finds that the Buyer is not a successor to the Seller or the bankruptcy estate by reason of any theory of law or equity, and the Buyer shall not assume or in any way be responsible for any liability of Seller or its bankruptcy estate except as otherwise expressly provided in this Agreement; and

(9)     Orders that the Sale Order be expressly binding upon any trustee in the event of conversion of the bankruptcy case of the Seller to a case under chapter 7 or the appointment of a chapter 11 trustee.

(ii)     The representations and warranties of Seller contained herein shall be true and correct in all material respects as of the Effective Date and as of the Closing Date.

(iii)     There shall be no default with respect to any material obligation of Seller hereunder which Seller has not cured within twenty (20) days after written notice from Buyer.

(iv)     There shall be no notice issued after the Effective Date of any material violation or alleged violation of any law, rule, regulation or code, including, without

11

limitation, any building code, with respect to the Facility, which has not been corrected to the satisfaction of the issuer of the notice.

(v)    There shall be no material default on the part of Seller or any other party under any agreement to be assigned to, or obligation to be assumed by, Buyer under this Agreement.

(vi)    All licenses, consents, approvals or other authorizations from third parties or governmental authorities required in connection with the transactions contemplated hereunder, including, without limitation, all licenses and approvals by agencies charged with regulating or licensing Senior Housing Facilities, shall have been obtained by, and issued in the name of, Buyer or its property manager or designee.

(vii)    There shall have been no material adverse change in the business, properties, operations or condition (financial, physical, title, licensing, environmental or otherwise) of Seller or the Facility since expiration of the Due Diligence Period.

(viii)    No proceedings (including, but not limited to, regulatory proceedings) shall be pending or threatened that could or would involve the change, redesignation, redefinition or other modification of the zoning classifications (or any building, environmental or code requirements applicable to) in a manner that would materially adversely affect the Assets.

(ix)    The Title Company shall be prepared to issue an owner's policy to Buyer taking no exception (i) to coverage other than those exceptions approved or accepted by Buyer pursuant to Section 3.3 or (ii) as to the finality or appeal of the Sale Order.  Buyer will use its best efforts to remove any exception relating to the Sale Order (other than an appeal relating to any good faith finding in the Sale Order) or any issue that may cause Buyer to receive anything less than the full benefit of its bargain expected under this Agreement.  The Buyer shall close the transaction contemplated by this Agreement if the Title Company does not issue an owner's policy as set forth in (ii) above if the Bank agrees to indemnify the Buyer for any loss related to such a closing pursuant to an indemnification agreement acceptable to Buyer, acting reasonably.  Buyer shall not be obligated to close if the Sale Order is subject to an appeal as to any good faith finding in the Sale Order.

(b)    Conditions to Seller's Obligation to Close.  As a condition to Seller's obligation to close with respect to the Assets on the Closing Date:

(i)    The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall not be stayed.

(ii)    The representations and warranties of Buyer contained herein shall be true and correct in all material respects as of the Effective Date and as of the Closing Date.

(iii)    There shall be no default with respect to any material obligation of Buyer hereunder which Buyer has not cured within twenty (20) days after written notice from Seller; and

110855143.8

(iv)    All those covenants set forth herein to be performed by Buyer at or prior to Closing shall have been performed or waived by Seller in writing.

5.4.    Seller's Deliveries.  On or before the Closing Date, Seller shall deliver in escrow to the Escrow Agent or outside of escrow to Buyer the following, each duly executed and, where appropriate, in recordable form and notarized:

(a)    Deed.  A quitclaim deed, executed and acknowledge by Seller, conveying to Buyer good, indefeasible and marketable fee-simple title to the Real Property, free and clear of all Encumbrances, subject only to the Permitted Exceptions ( the "Deed");

(b)    Bill of Sale and Assignment Agreement.  A bill of sale and assignment agreement in the form of Exhibit I attached hereto (the "Bill of Sale"), executed and acknowledged by Seller, vesting in Buyer good title to the Personal Property described therein free and clear of any Encumbrances and assigning all of Seller's rights under the Accepted Service Contracts to Buyer;

(c)    Assignment of Leases and Residency Agreements.  An assignment of Leases and Residency Agreements in the form of Exhibit J attached hereto (the "Assignment of Residency Agreements"), executed and acknowledged by Seller, vesting in Buyer good title to the Residency Agreements and Leases which Buyer elects to assume prior to Closing ;

(d)    Notice to Residents and Vendors.  A notice to each resident in a form requested by Buyer as well as a notice to each vendor under the Accepted Service Contracts in form requested by Buyer;

(e)    State Law Disclosures.  Such disclosures and reports as are required by applicable state and local law in connection with the conveyance of real property;

(f)    FIRPTA.  An affidavit of Seller substantially in the form of Exhibit K attached hereto.  If Seller fail to provide the necessary affidavit and/or documentation of exemption on the Closing Date, Buyer may proceed in accordance with the withholding provisions imposed by Section 1445 of the Internal Revenue Code of 1986, as amended;

(g)    CCRs.  The estoppels and assignments concerning the CCRs, as provided in Section 3.6;

(h)    Certificates of Title.  Certificates of title and leases (if applicable) for each Vehicle.

(i)    Authority.  Evidence of the existence, organization and authority of Seller and of the authority of the persons executing documents on behalf of Seller reasonably satisfactory to the Title Company and Buyer;

(j)    Title Documents.  Affidavits required by the Title Company sufficient to have the general exceptions deleted together with such other documents and instruments required by the Title Company in order to issue the Title Policy;

13

(k) <u>Due Diligence Materials</u>.  To the extent not previously delivered to Buyer, true, correct and complete originals, or copies, if originals are not available, of each Seller's Deliverables.

(l) <u>Rent Roll</u>.  A Rent Roll for the Facility, prepared as of a date no earlier than two (2) business days prior to the Closing Date, certified by Seller to be true, complete and correct through such date;

(m) <u>Closing Certificate</u>.  A certificate, signed by Seller, certifying to Buyer that the representations and warranties of Seller contained in this Agreement are true and correct in all material respects as if made on and as of the Closing Date and that all covenants required to be performed by Seller prior to the Closing Date have been performed in all material respects;

(n) <u>Settlement Statement</u>.  A settlement statement, duly executed by Seller; and

(o) <u>Permits and Approvals</u>.  All licenses, permits and approvals related to the construction, development ownership, operation and use of the Assets, including without limitation, certificate(s) of occupancy and all licenses required to operate the Facility as a Senior Housing Facility;

(p) <u>Plans and Specifications</u>.  All plans and specifications relating to the Assets in Seller's possession and control or otherwise available to Seller;

(q) <u>Other Deliveries</u>.  Such other documents, certificates and instruments reasonably necessary in order to effectuate the transaction described herein, including, without limitation, gap indemnity agreements, transfer tax declarations, broker lien waivers and any documents or representations necessary to comply with any applicable environmental transfer disclosure laws and any other Closing deliveries required to be made by or on behalf of Seller.

5.5. <u>Buyer's Deliveries</u>.  On or before the Closing Date, Buyer shall deposit the balance of the Purchase Price, plus or minus applicable prorations and adjustments as set forth herein, in immediately available, same-day federal funds wired for credit into the Escrow Agent's escrow account.  In addition, except as specified below, on or before the Closing Date, Buyer shall deliver in escrow to the Escrow Agent or outside of escrow to Seller the following, each duly executed and, where appropriate, in recordable form and notarized:

(a) <u>Bill of Sale</u>.  The Bill of Sale, executed by Buyer;

(b) <u>Assignment of Residency Agreements</u>.  The Assignment of Residency Agreements, executed by Buyer;

(c) <u>State Law Disclosures</u>.  Such disclosures and reports as are required by applicable state and local law in connection with the conveyance of real property;

(d) <u>Settlement Statement</u>.  A settlement statement, duly executed by Buyer;

14

(e)  Other Deliveries.  Such other documents, certificates and instruments reasonably necessary in order to effectuate the transactions described herein and any other Closing deliveries required to be made by or on behalf of Buyer.

5.6.  Possession.  Seller shall deliver possession of the Assets to Buyer at the Closing.

5.7.  Delivery of Books and Records.  Immediately after Closing, Seller shall deliver the following to the offices of Buyer (or the parties shall arrange for delivery of the following at the Facility):  the original documents and instruments assigned to Buyer pursuant to the terms hereof; copies or originals of all books and records of account, copies of correspondence with tenants and suppliers, receipts for deposits, unpaid bills and other papers or documents which pertain to the Facility; all advertising materials, booklets, keys and other items, if any, pertaining to the Facility; electronic and hard copies of all databases for residents and prospective residents of the Facility; and, if in Seller's possession or control, the original "as-built" plans and specifications, and all other available plans and specifications for the Facility.  Seller shall cooperate with Buyer after Closing to transfer to Buyer any such information stored electronically.

## ARTICLE 6:  PRORATIONS; COSTS; ADJUSTMENTS

6.1.  Prorations.  Not less than three (3) business days prior to Closing, Seller shall provide to Buyer such information and verification reasonably necessary to support the prorations under this Article 6.  The items in this Section 6.1 shall be prorated between Seller and Buyer as of the close of business on the day immediately preceding the applicable Closing Date, the Closing Date being a day of income and expense to Buyer.  Credits to Buyer shall be credited against the Purchase Price to be paid hereunder and, if such amount is exhausted, shall be paid in cash by Seller to Buyer at the Closing.  Post-closing re-prorations and adjustments shall be paid in cash.  Subject to the foregoing and for the other provisions of this Article 6, the following items shall be prorated and adjusted at Closing:

(a)  Taxes and Assessments.  Buyer shall receive a credit for any accrued but unpaid real estate taxes, personal property taxes, special assessments and betterments ("Taxes") (including, without limitation, any assessments imposed by private covenant) applicable to any period before the Closing Date, whether or not such Taxes are not yet due and payable, and Seller shall receive a credit for any Taxes applicable to any period after the Closing Date paid in advance by Seller.  If the amount of any such Taxes have not been determined as of the Closing Date, then such credit shall be based on the most recent ascertainable taxes.  Such undetermined Taxes shall be re-prorated upon issuance of the final tax bill.  Notwithstanding the foregoing, (i) Buyer shall receive from Seller a credit for any special assessments and betterments which are levied or charged against the Assets or the Real Property with respect to any infrastructure improvements specifically made to serve the Facility, whether or not then due and payable, and (ii) any other special assessments and betterments shall be prorated only for the year of Closing.

(b)  Collected Rent.  Buyer shall receive from Seller a credit for any rent and other income (and any applicable state or local tax on rent) under the Residency Agreements (and any Leases assigned to and assumed by Buyer) collected by Seller on or before Closing that applies to any period after Closing.  Uncollected rent and other uncollected income shall not be

15

prorated at Closing. After Closing, Buyer shall apply all rent and income collected by Buyer from any resident (or other tenant), first to the costs of such collection, then to such resident's (or other tenant's) current monthly rental and then to arrearages in the reverse order in which they were due, remitting to Seller any balance properly allocable to Seller's period of ownership. Buyer shall bill and use commercially reasonable efforts to collect such rent arrearages in the ordinary course of business, but Buyer shall not be obligated to engage a collection agency or take legal action to collect any rent arrearages or to terminate any Residency Agreement (or Lease). From and after Closing, Seller shall not have the right to seek collection of any rents or other income applicable to any period before the Closing. Any rent or other income received by Seller after Closing which is owed to Buyer shall be held in trust and remitted to Buyer promptly after receipt for allocation and disbursement as provided in this Section 6.1(b).

(c)     Resident Deposits. All security deposits (and interest thereon if required by law or contract to be earned thereon) and prepaid rent (and interest thereon if required by law or contract to be earned thereon) under any Residency Agreement (or Lease) shall be transferred or credited to Buyer at Closing. As of Closing, Buyer shall assume Seller's obligations related to resident (and other tenant) security deposits and prepaid rent, but only to the extent they are properly credited and transferred to Buyer.

(d)     Leasing Commissions. On or before the Closing Date, Seller shall pay in full all leasing commissions due to leasing or other agents for the current remaining term of each Residency Agreement (or other lease), determined without regard to any unexercised termination or cancellation right); provided, however, that if any leasing agent will not accept such payment, then Buyer shall receive a credit against the Purchase Price at Closing in an amount equal to the then-unpaid leasing commissions and Buyer shall assume, in writing, the obligation to pay any such leasing commissions due thereunder after the Closing Date up to the amount of such credit.

(e)     Other Revenues and Income. At Closing, Seller shall pay to or at the direction of Buyer any and all revenues and income in connection with the operation of the Assets not covered above and collected by or on behalf of Seller before the Closing and applicable to Buyer's period of ownership, and if such payment cannot be determined at Closing, such payment shall be based upon Buyer's reasonable estimate. The parties shall use reasonable efforts to make a final determination of such amount and make an appropriate adjusting payment within ninety (90) days after Closing. In addition, each party shall promptly remit or cause to be remitted to the other any such revenues and income collected by such party after Closing and applicable to the other party's period of ownership.

6.2.    Utilities.

(a)     Except for utilities which are in the name of and billed directly to residents or other tenants, Seller shall cause the meters, if any, for utilities to be read the day on which the Closing Date occurs and to pay the bills rendered on the basis of such readings. If any such meter reading for any utility is not available, then adjustment therefor shall be made on the basis of the most recently issued bills therefor which are based on meter readings no earlier than thirty (30) days before the Closing Date; and such adjustment shall be re-prorated when the next utility bills are received.

110855143.8

(b)     Seller shall receive a credit for the amount of deposits, if any, with utility companies and other service providers, if any, that are transferable and that are assigned to Buyer at the Closing.

6.3.    Service Contracts.  Seller or Buyer, as the case may be, shall receive a credit for regular charges under Accepted Service Contracts (and any other items of prepaid expense with respect to any obligation of Seller assumed by Buyer pursuant to the terms and conditions hereof) paid and applicable to Buyer's period of ownership, or payable and applicable to Seller's period of ownership, respectively.  Seller shall pay at Closing all amounts owing under those Service Contracts that are not Accepted Service Contracts.

6.4.    Accrued Employee Benefits.  At Buyer's option, Seller shall either (i) pay to any Employee hired by Buyer pursuant to Section 3.5 hereof the amount of all Accrued Employee Benefits for such Employee accruing prior to the Closing Date, or (ii) give Buyer a credit against the Purchase Price in such amount.  In the event of any dispute between the records of Seller and any Employee as to the amount due to such Employee, the higher amount shall control for purposes of the foregoing adjustment.

6.5.    Sales, Transfer, and Documentary Taxes; Closing Costs.

(a)     Unless exempted by the Sale Order, Seller shall pay at Closing all sales and gross receipts taxes and Buyer and Seller shall each pay one-half of the conveyancing, stamp, excise, documentary, transfer, deed or similar taxes or fees imposed in connection with this transaction under applicable state, county or local law.  Seller and Buyer shall execute any applicable city, county and state transfer tax or other declarations.

(b)     Buyer shall pay:  (i) one-half of the Escrow Agent's escrow fee, closing charges and any cancellation fee, (ii) the costs associated with Buyer's due diligence activities, (iii) the cost of the Title Policy and Survey.  Seller shall pay (x) one-half of the Escrow Agent's escrow fee, closing charges and any cancellation fee, and (y) all recording fees or other charges incurred in connection with clearing title, including without limitation any prepayment or release fees.  Each party shall be responsible for its own attorney's and other professional fees.

6.6.    Liabilities.  Except as expressly set forth herein, Seller shall not assume any Liability to the extent occurring and arising from and after the Closing Date as a result of Buyer's ownership and operation of the Assets.  Seller shall retain any Liability relating to or arising, whether before, on, or after the Closing, out of, or in connection with, any of the Excluded Service Contracts, including any Liability of Seller identified by Buyer as of the Closing Date.  Except for the Accepted Services Contracts expressly provided for in this Agreement, Buyer shall not assume any debts, obligations, warranties, claims (including resident claims) against or relating to the Assets, or any other Liability of Seller, whether express or implied, fixed or contingent, known or unknown, liquidated or unliquidated, accrued, asserted or unasserted, or otherwise.  The intent and objective of Buyer and Seller is that Seller retains, that Buyer does not assume, and that no transferee liability shall attach to Buyer in respect of, any liabilities or obligations of Seller of any nature whatsoever, except for the Accepted Services Contracts.  The elimination of any risk of transferee liability attaching to Buyer is a primary inducement to Buyer in entering into this transaction, in that Buyer would not have entered into

17

this transaction under circumstances where any transferee liability would or might attach to it. The negotiations of the Buyer and Seller with respect to the acquisition of the Assets were based upon the agreement that Buyer would not succeed to any liability of Seller or which is related in any way to the Assets.

6.7.    No Other Obligations.  No other expense related to the ownership or operation of the Assets shall be charged to or paid or assumed by Buyer under this Agreement, other than those obligations expressly assumed by Buyer in writing.

6.8.    Adjustment Procedure.  If Seller duly gives Buyer such notice of objection, and if Seller and Buyer fail to resolve the issues outstanding with respect to the foregoing prorations within thirty (30) days of Buyer's receipt of Seller's objection notice, Seller and Buyer shall submit the issues remaining in dispute to the Bankruptcy Court for adjudication. Seller and Buyer shall each bear its own fees and expenses relating to such adjudication.

## ARTICLE 7:  <u>REPRESENTATIONS AND WARRANTIES</u>

7.1.    Seller's Representations and Warranties.  As a material inducement to Buyer to execute this Agreement and consummate this transaction, Seller represents and warrants to Buyer as follows as of the date hereof (which representations, warranties shall also be true on the Closing Date as if made on the Closing Date):

(a)    <u>Organization and Authority of Seller</u>.  Each Seller has been duly organized, is validly existing, and is in good standing as a limited liability company in the State of New Hampshire.  Seller has the full right, power and authority and has obtained any and all consents required to enter into this Agreement, all of the documents to be delivered by Seller at the Closing and to consummate or cause to be consummated the transactions contemplated hereby.  This Agreement has been, and all of the documents to be delivered by Seller at the Closing will be, authorized and properly executed and constitutes, or will constitute, as appropriate, the valid and binding obligation of Seller, enforceable in accordance with their terms.

(b)    <u>Pending Actions or Proceedings</u>.  Except as directly related to the Sale Motion, there is no action or proceeding pending or, to Seller's knowledge, threatened against Seller or otherwise relating to the Facility.  To Seller's knowledge, no condemnation, eminent domain or similar proceedings are pending or threatened with regard to the Facility.  Seller has not received any notice and has no knowledge of any pending or threatened liens, special assessments, impositions or increases in assessed valuations to be made against the Facility.

(c)    <u>Conflicts; Filings</u>.  Neither the execution and the delivery of this Agreement, nor the consummation of the transactions contemplated hereby, will: (i) violate any law to which Seller is subject, or any provision of its operating agreement or certificate of formation; or (b) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which Seller is a party or by which it is bound or to which any of its assets is subject.  Seller is not required to give any notice to, make any filing with, or obtain any authorization, consent or

approval of any government or governmental agency in order for the parties to consummate the transactions contemplated by this Agreement.

(d)    Title. Seller has good, clear record and marketable title to the Assets, free and clear of all liens, encumbrances and restrictions, other than the matters described in Exhibit L attached hereto.

(e)    Vehicles and Equipment. Attached hereto as Exhibit F is a list of all vehicles owned or leased by Seller in connection with the operation of the Facility. The vehicles are not subject to any liens or encumbrances except as set forth on Exhibit F. Except for the personal property owned by Seller or others as listed on Exhibit C attached hereto, Seller owns and has good title to all Personal Property free and clear of any liens and encumbrances, except for the liens and encumbrances set forth on Exhibit F attached hereto and the lien of any mortgage which is to be satisfied in full by Seller and discharged at Closing.

(f)    Rent Roll and Residency Agreements. Set forth on Exhibit M hereto is a list of all of the Residency Agreements (and other leases), including all amendments thereto, guaranties relating thereto and side letters or other agreements relating thereto (the "Rent Roll"). Other than the Residency Agreements and leases listed in the Rent Roll, there are no leases or occupancy agreements relating to the Facility, and no party other than the residents and tenants under the Residency Agreements and other leases (if any), has any right to possess all or any portion of the Facility. The documents constituting the Residency Agreements and other leases that are delivered to Buyer pursuant to Section 3.1 are true, correct and complete copies of the Residency Agreements and other leases, including any and all amendments and guarantees. All information set forth in the Rent Roll is true, correct, and complete in all material respects as of its date. Except as set forth on the Rent Roll, there are no leasing or other fees or commissions due, nor will any become due, in connection with any Residency Agreement or other lease or any renewal or extension or expansion of any Residency Agreement or other lease, and no understanding or agreement with any party exists as to payment of any leasing commissions or fees regarding future leases or as to the procuring of residents or tenants. The Residency Agreements and other leases are in full force and effect and neither Seller nor, to Seller's knowledge, any resident or other tenant is in default under any Residency Agreement. No resident or other tenant has asserted in writing, nor are there, to Seller's knowledge, any defenses or offsets to rent accruing after the Closing Date. Seller has not assigned or pledged any Residency Agreement or other lease, or rents or any interest therein, to any person or entity other than existing mortgage lenders whose loans will be satisfied in full and discharged at Closing.

No residents in the Facility receive any assistance under any government assistance program and the no beds or units in the Facility are subject to affordability or income-based restrictions.

(g)    Service Contracts. Set forth on Exhibit N is a list of all of the Services Contracts. The documents constituting the Service Contracts that are delivered to Buyer pursuant to Section 3.1 are true, correct and complete copies of all the Service Contracts affecting the Facility. Neither Seller nor, to Seller's knowledge, any other party is in default in under any Service Contract.

(h)    Employment Matters.

110855143.8

(A)    Exhibit O attached hereto contains a list of all employees of Seller directly employed in the operation and management of the Facility (collectively, the "Employees"), including employees who are receiving short-term disability benefits or are on family and medical, medical/long-term disability, administrative, or military leave or any other type of leave that entitles the Employee to reinstatement upon completion of the leave under the applicable leave policies of Seller.   The Employees are employees of Seller (and not any Affiliate of Seller), except as otherwise expressly stated on Exhibit O.

(B)    Except for the Employees, there are no other persons directly employed in the operation or management of the Facility.

(C)    There are no contracts, express or implied, between Seller or any of its Affiliates and any Employees of the Facility for any term of duration of employment.

(D)    The Employees are not now represented, and at no time have the Employees been represented, by any labor organization for collective bargaining purposes, and no labor organization has commenced any effort to represent the Employees for collective bargaining purposes.

(E)    Neither Seller, nor any of its Affiliates has received any notice from (i) any Employee of the Facility that he or she is or claims to be represented for purposes of collective bargaining by a labor organization, or (ii) any labor organization claiming to be, or seeking to be, a collective bargaining representative for any Employees of the Facility.

(F)    There is no pending or threatened action, litigation, governmental proceeding, grievance, arbitration proceeding, unfair labor practice charge, or any complaint or charge issued by any federal, state or local governmental agency concerning any Employees of any of the Facility.

(G)    Except as provided in Section 6.4 hereof, all Employees of the Facility have been paid (or will be paid by Seller on or before Closing) all wages, salary, incentive payments, bonuses, commissions, draws, severance pay, vacation pay, holiday pay, sick pay, automobile or transportation pay or reimbursements, expense reimbursements, benefits, and any other form of remuneration whatsoever due to any past or present employee of the Facility for services provided to Seller and its Affiliates prior to the Closing.   In all payments to Employees of the Facility, all payroll withholdings, and deductions required by applicable law have been made, and all withheld amounts timely have been paid or will be paid by Seller or its Affiliates to the appropriate entities.

20

(H)     Exhibit P attached hereto lists each "employee benefit plan" (as such term is defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")) and each other material employee benefit plan, policy or arrangement sponsored by Seller or its Affiliates for the benefit of Employees associated with the Facility (each item listed on Exhibit P, a "Benefit Plan" and, collectively, the "Benefit Plans").

(I)     Each Benefit Plan has been maintained, funded and administered in material compliance with its terms and the requirements of applicable law.

(J)     Each Benefit Plan that is intended to meet the requirements of a "qualified plan" under Section 401(a) of the Internal Revenue Code of 1986, as amended (the "Code") has received a favorable determination letter from the Internal Revenue Service to the effect that it meets the requirements of Section 401(a) of the Code.

(K)     Neither Seller, nor any other entity that is treated as a single employer with Seller for purposes of Section 414 of the Code has any liability under Section 302 or Title IV of ERISA that could become a liability of Buyer.

(L)     No action, suit, proceeding, hearing or investigation with respect to the Benefit Plans (other than routine claims for benefits) is pending or threatened.

(M)     Neither Seller, nor any of its Affiliates is a party to any collective bargaining agreement or other labor agreement with any union or labor organization.

(i)     Operating Statements. The operating statements of Seller with respect to the Facility for the fiscal year ended December 31, 2016, delivered to Buyer pursuant to this Agreement, show all items of income and expense incurred in connection with the ownership, operation, and management of the Assets for the periods indicated and are true, correct, and complete in all material respects. No material adverse change has occurred from the respective dates of such operating statements to the date hereof.

(j)     Permits, Legal Compliance, and Notice of Defects. Seller has all licenses, permits and certificates necessary for the ownership, use and operation of the Assets, including, without limitation, all certificates of occupancy necessary for the occupancy of the Assets (the "Permits"). All of the Permits are in full force and effect, and Seller has not taken or failed to take any action that would result in their revocation, suspension or limitation, nor received any written notice of an intention to revoke, suspend or limit any of them. Neither the Assets nor the use thereof violates any Permit, governmental law or regulation or any covenants or restrictions encumbering the Assets. There are no physical defects in the Improvements. Seller has not received any written notice from any insurance company or underwriter, or is otherwise aware,

21

of any defects that would materially adversely affect the insurability of the Assets or cause an increase in insurance premiums. Seller has not received notice from any governmental authority or other person of, nor has any knowledge of, any violation of zoning, building, fire, health, environmental, or other statutes, ordinances, regulations or orders (including, without limitation, those respecting the Americans with Disabilities Act), or any restriction, condition, covenant or consent in regard to the Assets or any part thereof which have not been corrected to the satisfaction of the issuer.

(k)     Environmental.    Seller has no knowledge of any violation of any Environmental Law related to the Real Property or the presence or release of any Hazardous Materials on or from the Real Property except as disclosed in the environmental reports listed in Exhibit Q attached hereto (the "Environmental Reports"). Except for de minimis amounts of Hazardous Materials used, stored and disposed of in accordance with Environmental Laws, and used in connection with the ordinary maintenance and operation of the Assets, Seller has not manufactured, introduced, released or discharged from or onto the Assets any Hazardous Materials or any toxic wastes, substances or materials (including, without limitation, asbestos), and Seller has not used the Assets or any part thereof for the generation, treatment, storage, handling or disposal of any Hazardous Materials. Except as set forth in the Environmental Reports, there are no underground storage tanks located on the Real Property. Seller is not aware of any environmental assessments or studies which exist with respect to the Real Property except for the Environmental Reports.

(l)     ERISA.    Seller is not acting on behalf of (i) an "employee benefit plan" within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended, (ii) a "plan" within the meaning of Section 4975 of the Internal Revenue Code of 1986, as amended or (iii) an entity deemed to hold "plan assets" within the meaning of 29 C.F.R. §2510.3-101 of any such employee benefit plan or plans.

(m)     PATRIOT Act.    Seller is in compliance with the requirements of Executive Order No. 133224, 66 Fed. Reg. 49079 (Sept. 25, 2001) (the "Order") and other similar requirements contained in the rules and regulations of the Office of Foreign Assets Control, Department of the Treasury ("OFAC") and in any enabling legislation or other Executive Orders or regulations in respect thereof (the Order and such other rules, regulations, legislation, or orders are collectively called the "Orders"). Further, Seller covenants and agrees to make its policies, procedures and practices regarding compliance with the Orders, if any, available to Buyer for its review and inspection during normal business hours and upon reasonable prior notice. Neither Seller nor any beneficial owner of Seller:

(i)     is listed on the Specially Designated Nationals and Blocked Persons List maintained by OFAC pursuant to the Order and/or on any other list of terrorists or terrorist organizations maintained pursuant to any of the rules and regulations of OFAC or pursuant to any other applicable Orders (such lists are collectively referred to as the "Lists");

(ii)     is a person or entity who has been determined by competent authority to be subject to the prohibitions contained in the Orders; or

22

(iii)   is owned or controlled by, or acts for or on behalf of, any person or entity on the Lists or any other person or entity who has been determined by competent authority to be subject to the prohibitions contained in the Orders.

Seller hereby covenants and agrees that if Seller obtains knowledge that Seller or any of its beneficial owners becomes listed on the Lists or is indicted, arraigned, or custodially detained on charges involving money laundering or predicate crimes to money laundering, Seller shall immediately notify Buyer in writing, and in such event, Buyer shall have the right to terminate this Agreement without penalty or liability to Seller immediately upon delivery of written notice thereof to Buyer.

(n)   <u>No Rent Subsidies or Affordability Restrictions</u>.  Except as set forth in the Rent Roll, the senior housing units in the Assets are not subject to, nor do said senior housing units receive the benefit of, any rent subsidies or rental assistance programs or affordability or income-based restrictions or limitations.  To the knowledge of Seller, no senior housing unit is subject to any rent control law, ordinance or regulation.

(o)   <u>Medicare; Medicaid; Third Party Payor Programs</u>.  No portion of the income from the Assets is attributable to Medicare, Medicaid or any other public or private third party payor or other program.

(p)   <u>Utilities</u>.  Public utility services (including, without limitation, all applicable electric lines, sewer and water lines, gas, cable, television and telephone lines) are available to service the Assets at the property line without the need for any easements over land of others, and, to Seller's knowledge, said public utility services are adequate to service the requirements of the Assets and its tenants and occupants as presently operated, and all payments currently due for the same have been made, and all necessary easements, permits, licenses and agreements in respect of any of the foregoing exist and are in full force and effect and are installed and operating and all installation and connection charges have been paid for in full. Neither Seller, nor to Seller's knowledge, any prior owner of the Assets has received notice of any fact or condition existing and would or could result in the termination or reduction of the current access from the Assets to existing roads and highways, or to sewer or other utility services available to the Assets.

(q)   <u>Disclosure</u>.  Other than this Agreement, the documents delivered at Closing pursuant hereto, the Permitted Exceptions, the Residency Agreements and the Accepted Service Contracts, there are no contracts or agreements of any kind relating to the Assets to which Seller is a party and which would be binding on Buyer after Closing.  Seller has delivered to Buyer all written materials in Seller's possession or control which contain information or disclose facts or conditions that would have a material adverse impact on the use, operation or marketability of the Assets.  The originals and copies of Seller Deliverables delivered to Buyer pursuant to Section 3.1 hereof are true, correct and complete originals or copies of the respective documents, instruments, agreements or other items, and Seller is not aware of any material inaccuracy or omission in the information in Seller Deliverables.

(r)   <u>Manager/Management Agreement</u>.   There is no written management agreement or third-party manager relating to the Assets.

(s)     Exhibits. Notwithstanding the foregoing, the parties acknowledge that all of the Exhibits attached hereto have not been completed as of the date hereof. Seller shall deliver to Buyer any and all missing information in order to complete all of the Exhibits within three (3) days of the execution of this Agreement, all such Exhibits to be in form and substance acceptable to Buyer.

7.2.    Buyer's Representations and Warranties. As a material inducement to Seller to execute this Agreement and consummate this transaction, Buyer represents and warrants to Seller as follows as of the date hereof (which representations, warranties shall also be true on the Closing Date as if made as of the date thereof):

(a)     Organization and Authority. Buyer has been duly organized and is validly existing as a Delaware limited liability company. Buyer has the full right and authority and has obtained any and all consents required to enter into this Agreement and to consummate or cause to be consummated the transactions contemplated hereby. This Agreement has been, and all of the documents to be delivered by Buyer at the Closing will be, authorized and properly executed and constitutes, or will constitute, as appropriate, the valid and binding obligation of Buyer, enforceable in accordance with their terms.

(b)     Pending Action. There is no agreement to which Buyer is a party or to Buyer's knowledge binding on Buyer which is in conflict with this Agreement. There is no action or proceeding pending or, to Buyer's knowledge, threatened against Buyer which challenges or impairs Buyer's ability to execute or perform its obligations under this Agreement.

(c)     Conflicts; Filings. Neither the execution and the delivery of this Agreement, nor the consummation of the transactions contemplated hereby, will: (i) violate any law to which Buyer is subject, or any provision of its operating agreement or certificate of formation; or (ii) conflict with, result in a breach of, constitute a default under, result in the acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice under any agreement, contract, lease, license, instrument, or other arrangement to which Buyer is a party or by which it is bound or to which any of its assets is subject. Buyer is not required to give any notice to, make any filing with, or obtain any authorization, consent or approval of any government or governmental agency in order for the parties to consummate the transactions contemplated by this Agreement.

(d)     PATRIOT Act. Buyer is in compliance with the requirements of the Order and other similar requirements contained in the rules and regulations of OFAC and in any enabling legislation or other Orders. Further, Buyer covenants and agrees to make its policies, procedures and practices regarding compliance with the Orders, if any, available to Seller for its review and inspection during normal business hours and upon reasonable prior notice. Neither Buyer nor any beneficial owner of Buyer:

(i)      is listed on the Lists;

(ii)     is a person or entity who has been determined by competent authority to be subject to the prohibitions contained in the Orders; or

110855143.8

(iii) is owned or controlled by, or acts for or on behalf of, any person or entity on the Lists or any other person or entity who has been determined by competent authority to be subject to the prohibitions contained in the Orders.

(e) Buyer hereby covenants and agrees that if Buyer obtains knowledge that Buyer or any of its beneficial owners becomes listed on the Lists or is indicted, arraigned, or custodially detained on charges involving money laundering or predicate crimes to money laundering, Buyer shall immediately notify Seller in writing, and in such event, Seller shall have the right to terminate this Agreement without penalty or liability to Buyer immediately upon delivery of written notice thereof to Buyer.

7.3.    Intentionally Omitted.

7.4.    Survival of Representations and Warranties.  The representations and warranties set forth in this Article 7 are made as of the Effective Date, and each party shall be deemed to have remade all of their respective representations and warranties as of the Closing Date.  No representations or warranties shall (i) be deemed to be merged into or waived by the instruments of Closing or (ii) survive the Closing.

## ARTICLE 8:  <u>DEFAULT AND REMEDIES</u>

8.1.    Buyer's Remedies.  If Seller shall be in material default under this Agreement, which default is not cured within ten days following written notice from the Buyer specifying the default, then Buyer shall be entitled to such remedies for breach of contract as may be available at law and in equity, including, without limitation, immediate refund of the Deposit and all interest earned thereon and the remedy of specific performance.  In addition, if, after any default by Seller of a material nature, Buyer elects not to proceed with the Closing, then Seller shall, on demand and as Buyer's sole and exclusive damages remedy, reimburse Buyer for all reasonable out-of-pocket expenses incurred by Buyer in connection with this Agreement (including, without limitation, all legal and other professional fees), due diligence expenses and expenses relating to licensing.

8.2.    Seller's Remedies.  If Buyer shall be in material default under this Agreement, which default is not cured within ten days following written notice from the Seller specifying the default, then Seller's sole remedy shall be to terminate this Agreement and receive the Deposit, as liquidated damages, as Seller's sole and exclusive remedy at law or in equity (Seller waiving all other rights or remedies in the event of such default by Buyer and the parties hereby acknowledging that Seller's actual damages in the event of a default by Buyer under this Agreement will be difficult to ascertain, and that such liquidated damages represent the parties' best estimate of such damages).

8.3.    Other Expenses.  If this Agreement is terminated due to the default of any party, then the defaulting party shall pay any fees due to the Escrow Agent.

8.4.    Termination.  In addition to the foregoing, Buyer may, upon written notice to Seller, terminate this Agreement:

(a)      if Seller does not file the Sale Motion and the Bid Procedures Motion with the Bankruptcy Court by the date that is five (5) days after the expiration of the Due Diligence Period;

(b)      if the Bidding Procedures Order shall not have been entered by the Bankruptcy Court by the date that is ten (10) days after the filing of the Bid Procedures Motion; provided, however, that this Agreement may not be terminated pursuant to this clause (i) in the event that Seller timely moved the Bankruptcy Court to enter the Bidding Procedures Order and the Bankruptcy Court's schedule is the reason that the entry of the Bidding Procedures Order has not occurred on or before such date or (ii) Buyer's breach of any of its representations and warranties contained in this Agreement and failure to perform any of its obligations hereunder is the reason that the entry of the Bidding Procedures Order has not occurred on or before such date;

(c)      prior to entry of the Sale Order if: (i) Seller enters into a definitive agreement with respect to an Alternate Transaction; (ii)  the Bankruptcy Court enters an order approving an Alternate Transaction; or (iii) if Buyer is not the successful bidder at the Auction;

(d)      so long as Buyer is not in breach of its obligations under this Agreement in any material respect, upon a material breach of any covenant, agreement, representation, or warranty of Seller set forth in this Agreement, which breach is not cured within ten (10) business days following written notice to the Seller or which breach, by its nature, cannot be cured prior to the Closing Date;

(e)      at any time following entry of the Bidding Procedures Order, but prior to entry of the Sale Order, upon or following the date that an order of any court of competent jurisdiction shall be entered (i) vacating or reversing the Bidding Procedures Order or (ii) amending, supplementing, or otherwise modifying the Bidding Procedures Order and Buyer does not consent to the amendment, supplement, or modification, such consent not to be unreasonably conditioned, withheld, or delayed;

(f)      upon or following the date which is thirty (30) days  after the date the Bidding Procedures Order is first entered by the Bankruptcy Court if the Auction shall not have been completed by such date (if the Auction is required to occur pursuant to the Bidding Procedures Order);

(g)      if the Bankruptcy Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code and neither such dismissal nor conversion expressly contemplates the transactions provided for in this Agreement; or

(h)      if any secured creditor of Seller obtains relief from the automatic stay to foreclose on any of the acquired Assets.

(i)      if the Sale Order is not entered by the date which is ten (10) days after the Auction  or upon or following the date on which the Bankruptcy Court shall have stated unconditionally that it will not enter the Sale Order; provided, however, that this Agreement may not be terminated pursuant to this section (i) in the event that Seller timely moved the Bankruptcy Court to enter the Sale Order and the Bankruptcy Court's schedule is the reason that

26

the entry of Sale Order has not occurred on or before such date or (ii) Buyer's breach of any of its representations and warranties contained in this Agreement and failure to perform any of its obligations hereunder is the reason that the entry of the Sale Order has not occurred on or before such date; or

      (j)     if the Petition Date does not occur on or before the date that is five (5) days after the expiration of the Due Diligence Period.

    8.5.    Break-Up Fee

      (a)     Seller shall pay to Buyer a cash amount equal to $250,000.00 (the "Break-Up Fee") if (i) Seller closes on an Alternative Transaction or (ii) another bidder is deemed the Successful Bidder following the Auction, subsequently fails to close its transaction, and forfeits its deposit under its asset purchase agreement. Seller shall pay the Buyer the Break-Up Fee within two (2) business days of Buyer's written demand for the Break-Up Fee under these circumstances. This Seller obligation is in addition to its obligation to return to Buyer the Deposit in accordance with the terms of this Agreement.

      (b)     Seller shall cause the Break-Up Fee to be paid pursuant to the terms of this Agreement in immediately available funds and without need for further order of or from the Bankruptcy Court (other than the Bidding Procedures Order).

      (c)     Seller acknowledges and agrees that (i) the payment of the Break-Up Fee are integral parts of the transactions contemplated by this Agreement, (ii) in the absence of Seller's obligations to make these payments, Buyer would not have entered into this Agreement, (iii) time is of the essence with respect to the payment of the Break-Up Fee, and (iv) the Break-Up Fee shall constitute an administrative expense of the Seller's estate under Section 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code. To the extent that all amounts due in respect of the Break-Up pursuant to this Section 8.5 have actually been paid by Seller to Buyer, Buyer shall not have any additional recourse against any Seller or its Affiliates for any Liabilities relating to or arising from this Agreement.

## ARTICLE 9: NON SOLICITATION; NON COMPETE

    9.1.    Non-Solicitation.   In consideration of the premises contained herein, the consideration to be received hereunder and in consideration of and as an inducement to Buyer to consummate the transactions contemplated hereby, Seller and Principals hereby agree that until the second (2nd) anniversary of the Closing Date, Seller and Principals shall not and shall not suffer or permit any of its Affiliates to, directly or indirectly (i) solicit or attempt to induce any employee of Buyer or any Affiliate of Buyer to terminate his or her employment with Buyer or any Affiliate of Buyer; or (ii) hire or attempt to hire any employee of Buyer or any Affiliate of Buyer except on an unsolicited basis at the request of such employee.

    9.2.    Non-Compete.   In consideration of the premises contained herein, the consideration to be received hereunder and in consideration of and as an inducement to Buyer to consummate the transactions contemplated hereby, Seller hereby agrees that, if the Closing hereunder occurs, Seller shall not, and shall not suffer or permit any Principal to, develop, construct, own, lease, acquire, manage, operate or otherwise directly or indirectly participate in

110855143.8

any Competing Project prior to the second (2nd) anniversary of the Closing Date; provided, however, that the foregoing provisions of this Section 9.2 shall not apply to any Senior Housing Facility currently owned, leased, managed or operated by Seller or any of its Affiliates as of the date hereof and listed on Exhibit H attached hereto.

9.3.    Enforcement.  Seller acknowledges and recognizes the highly competitive nature of the senior housing industry.  Seller has carefully considered the nature and extent of the restrictions set forth herein and acknowledges that the same are reasonable with respect to scope, duration and territory.  It is the desire and intent of the parties that the provisions of this Article 9 be enforced to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought.  Accordingly, if any particular provision of this Article 9 shall be adjudicated to be invalid or unenforceable, such provision without any action by any party shall be deemed amended to delete therefrom or to modify the provisions thereof so as to restrict (including, without limitation, a reduction in duration, geographical area or prohibited business activity) the portion adjudicated to be invalid or unenforceable, such deletion or modification to apply only with respect to the operation of such provision in the particular jurisdiction in which such adjudication is made, and such deletion or modification to be made only to the extent necessary to cause the provision as amended to be valid and enforceable.  The parties hereto recognize and acknowledge that a breach by Seller of this Article 9 will cause irreparable and material loss and damage to Buyer as to which Buyer will not have an adequate remedy at law or in damages.  Accordingly, each party acknowledges and agrees that the issuance of an injunction or other equitable remedy is an appropriate remedy for any such breach in addition to, and without limiting, any other remedies that the Buyer may have at law or in equity.

## ARTICLE 10: **MISCELLANEOUS**

10.1.    Parties Bound.  Neither party may assign this Agreement without the prior written consent of the other, and any such prohibited assignment shall be void; provided, however, that Buyer may assign its rights and obligations under this Agreement without Seller's consent to any entity in which Buyer or any principals thereof will have an ownership interest.  Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the respective legal representatives, successors, assigns, heirs, and devises of the parties.

10.2.    Headings.    The article and paragraph headings of this Agreement are for convenience only and in no way limit or enlarge the scope or meaning of the language hereof.

10.3.    Invalidity and Waiver.  If any portion of this Agreement is held invalid or inoperative, then so far as is reasonable and possible the remainder of this Agreement shall be deemed valid and operative, and, to the greatest extent legally possible, effect shall be given to the intent manifested by the portion held invalid or inoperative.  The failure by either party to enforce against the other any term or provision of this Agreement shall not be deemed to be a waiver of such party's right to enforce against the other party the same or any other such term or provision in the future.

10.4.    Governing Law.  This Agreement shall, in all respects, be governed, construed, applied, and enforced in accordance with the laws of the State of New Hampshire.

110855143.8

10.5.    Survival.  The provisions of this Agreement shall not survive Closing.

10.6.    No Third Party Beneficiary.  This Agreement is not intended to give or confer any benefits, rights, privileges, claims, actions, or remedies to any person or entity as a third party beneficiary, decree, or otherwise.

10.7.    Entirety and Amendments.   This Agreement embodies the entire agreement between the parties and supersedes all prior agreements and understandings relating to the Assets.  This Agreement may be amended or supplemented only by an instrument in writing executed by the party against whom enforcement is sought.

10.8.    Time.  Time is of the essence in the performance of this Agreement.

10.9.    Notices.  All notices required or permitted hereunder shall be in writing and shall be served on the parties at the addresses set forth in Exhibit R.  Any such notices shall be either (i) sent by overnight delivery using a nationally recognized overnight courier, in which case notice shall be deemed delivered on the date of deposit with such courier, (ii) sent by certified or regular U.S. mail, postage prepaid, in which case notice shall be deemed delivered on the date of deposit with the U.S. Postal Service, (iii) sent by email or facsimile, in which case notice shall be deemed delivered upon transmission thereof so long as a copy thereof is also sent by overnight delivery using a nationally recognized overnight courier by depositing such copy on such date of delivery by email or facsimile with such courier, or (iv) sent by personal delivery, in which case notice shall be deemed delivered upon receipt or refusal of delivery.  A party's address may be changed to another address in the United States by written notice to the other party; provided, however, that no notice of a change of address shall be effective until actual receipt of such notice.  Copies of notices are for informational purposes only, and a failure to give or receive copies of any notice shall not be deemed a failure to give notice.  Notices given by counsel to Buyer shall be deemed given by Buyer and notices given by counsel to Seller shall be deemed given by Seller.

10.10.   Construction.  The parties acknowledge that the parties and their counsel have reviewed and revised this Agreement and the documents to be executed at the Closing and agree that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be applied in the interpretation of this Agreement, the documents to be delivered at Closing or any exhibits or amendments thereto.

10.11.   Calculation of Time Periods.  Unless otherwise specified, in computing any period of time described herein, the day of the act or event after which the designated period of time begins to run is not to be included and the last day of such period is to be included, unless such last day is a Saturday, Sunday or legal holiday for national banks in the State of New Hampshire, in which event the period shall run until the end of the next day which is neither a Saturday, Sunday, nor legal holiday.

10.12.   Execution in Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of such counterparts shall constitute one Agreement.  To facilitate execution of this Agreement, the parties may execute and exchange by telephone facsimile counterparts of the signature pages.

10.13. Further Assurances.   In addition to the acts and deeds recited herein and contemplated to be performed, executed and/or delivered by either party at Closing, each party agrees to perform, execute and deliver, but without any obligation to incur any additional liability or expense, on or after the Closing any further deliveries and assurances as may be reasonably necessary to consummate the transactions contemplated hereby or to further perfect the conveyance, transfer and assignment of the Assets to Buyer.

10.14. Waiver of Jury Trial.   TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE PARTIES HEREBY IRREVOCABLY WAIVE ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY.

10.15. Bulk Sales.   If any applicable provisions of law require that any state or local taxation authorities be notified of the transactions contemplated herein, or if clearance is required of such authorities, each in order to permit the transfer of the Real Property as contemplated herein without liability to Buyer for any state or local taxes required to be paid or collected by Seller prior to the Closing Date, it shall be a condition precedent to the obligations of Buyer hereunder that all such notification and clearance requirements shall have complied with and the Buyer shall have received the requisite clearances and releases from further liability.   Seller shall, within ten (10) days after the Effective Date make all filings necessary to obtain such clearances, and shall contemporaneously provide Buyer with copies of all such filings.

10.16. Release.  Seller and each Principal each hereby represents, warrants and agrees that none of them has any claim or cause of action against Buyer or any of Buyer's Affiliates. Seller and each Principal unconditionally and irrevocably releases, remises, waives and forever discharges Buyer, its Affiliates, and each of the respective partners, directors, officers, employees, shareholders, attorneys and agents of Buyer and its Affiliates, and the respective heirs, administrators, executors, successors and assigns of each of the foregoing (collectively the "Releasees") of and from any and all manner of action and actions, cause and causes of actions, suits, debts, dues, sums of money, accounts, reckoning, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, extents, executions, claims and demands whatsoever (collectively, the "Claims"), in law or in equity, including, but not limited to, any and all claims which are presently unknown, unsuspected, unanticipated or undisclosed, which claims against each Releasee Seller or each Principal ever had, now has or hereafter can, shall or may have for, upon or by reason of any matter, cause or thing whatsoever from the beginning of the world to the date hereof under, in connection with or relating to the Assets and/or this Agreement.

10.17. Additional Bankruptcy Provisions

(a)      Each party hereto irrevocably submits to the exclusive jurisdiction of, and venue in, the Bankruptcy Court for the District of New Hampshire for any actions or proceedings arising out of or relating to this Agreement or the transactions contemplated hereby and waives any objection or defense it may now or hereafter have based on inconvenient forum in any such actions or proceedings. If (a) the Bankruptcy Court does not have or declines to exercise subject matter jurisdiction over or (b) the Bankruptcy Case is closed prior to commencement of any action or proceeding arising out of or relating to this Agreement or the transactions contemplated

110855143.8

hereby, each party hereto agrees that all such actions or proceedings shall be heard and determined in a federal court sitting in the District of New Hampshire and each party irrevocably submits to the jurisdiction of such courts and irrevocably waives any objection or defense it may now or hereafter have based on inconvenient forum in any such action or proceeding. Each party agrees that any party may file a copy of this paragraph with any court as written evidence of the knowing, voluntary, and bargained agreement between the parties irrevocably to waive any objections to venue or to convenience of forum.

(b)     The rights and interests of Seller hereunder shall be binding upon any subsequent trustee appointed under Chapter 11 or Chapter 7 of the Bankruptcy Code or any other person appointed as a successor to Seller pursuant to a confirmed Chapter 11 plan.

(c)     Except to the extent that mandatory provisions of the Bankruptcy Code apply, this Agreement shall be governed by, and construed and enforced in accordance with, the internal laws of the State of New Hampshire, without regard to choice or conflict of law principals thereof.

(d)     Any obligation of Seller hereunder shall constitute a super-priority administrative claim under Sections 503 and 507 of the Bankruptcy Code, and Buyer shall be deemed to have a first priority lien on and security interest in all sale proceeds relating to any sale of the assets subject of this Agreement, senior to the claims of all creditors, to secure payment of the Break-Up Fee.

(e)     The parties agree and acknowledge that to the extent any terms and provisions of this Agreement are in any way inconsistent with or in conflict with any term, condition, or provision of any other transaction document referred to herein, this Agreement shall govern and control. Following entry of the Sale Order by the Bankruptcy Court, to the extent that any terms and provisions of this Agreement or any transaction document are in conflict or inconsistent with any term, condition, or provision of the Sale Order, the Sale Order shall govern and control.

(f)     To the extent that Buyer is not the Successful Bidder at the Auction, Buyer hereby agrees to serve as the Back-Up Bidder, to the extent that the Seller deems Buyer's final bid to be the second highest and best offer at the Auction.  Notwithstanding anything to the contrary herein, if Buyer is the Back Up Bidder, Buyer shall not be entitled to the return of its deposit or payment of the Break-Up Fee until the Successful Bidder closes on the Alternative Transaction."  Further notwithstanding the foregoing, if Buyer is the Back-Up Bidder, Buyer shall not be obligated to close on the transaction and purchase the Assets if: (1) such closing does not take place on or before August 15, 2017, or (2) there has been any material adverse change to the business, properties, operations or condition (financial, physical, title, licensing, environmental or otherwise) of Seller or any of the Assets during the period of time from the Auction to the new closing date.

*[Remainder of this page intentionally left blank; signature page follows]*

31

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Agreement on the day and year written below.

SELLER:

SANCTUARY CARE LLC,
a New Hampshire limited liability company

Dated: _____       By: _____
                                      Name:
                                      Title:


SANCTUARY AT RYE OPERATIONS LLC,
a New Hampshire limited liability company

Dated: _____       By: _____
                                      Name:
                                      Title:


BUYER:

NBR ACQUISITION RYE, LLC,
a Delaware limited liability company

Dated: March 8, 2017            By: _____
                                      James C. Coughlin
                                      Authorized Signatory


*[Signature Page to Asset Purchase Agreement]*

IN WITNESS WHEREOF, the parties hereto have duly executed and delivered this Agreement on the day and year written below.

SELLER:

SANCTUARY CARE LLC,
a New Hampshire limited liability company

Dated: 3-8-2017

By: _____
Name: JONATHAN MC Coy
Title: MEMBER

SANCTUARY AT RYE OPERATIONS LLC,
a New Hampshire limited liability company

Dated: 3-8-2017

By: _____
Name: JONATHAN McCoy
Title: MEMBER

BUYER:

NBR ACQUISITION RYE, LLC,
a Delaware limited liability company

Dated: _____

By: _____
James C. Coughlin
Authorized Signatory

*[Signature Page to Asset Purchase Agreement]*

## JOINDER

Jonathan McCoy and Scott Kingsley, as owners of beneficial interests in Seller (collectively, "Principals"), hereby acknowledge and agree that they will derive substantial benefits from the consummation of the transactions herein described. Accordingly, Principals hereby agree to comply with the covenants and requirements of Article 9 of the Agreement as though each reference therein to "Seller" were instead a reference to "Principals" and agree to be bound by the provisions set forth in Section 10.16 of the Agreement. The provisions of this Joinder shall survive Closing.

Executed under seal as of the date first above written.

PRINCIPALS:

_____
Jonathan McCoy

_____
Scott Kingsley

## JOINDER

Stewart Title Guaranty Company hereby joins this Agreement for the sole purpose of agreeing to be bound by the provisions of Sections 2.2 and 2.3 hereof.

Stewart Title Guaranty Company

By: _____
Joseph P. Sullivan, Esq.
Underwriting Counsel

## List of Exhibits

| Exhibit | Description |
|---------|-------------|
| A | Definitions |
| B | Property Information |
| C | Personal Property Owned by Seller |
| D | Description of Land |
| E | Intentionally Omitted |
| F | Vehicles |
| G | Seller Deliverables |
| H | Exceptions to Non-Compete |
| I | Form of Bill of Sale and General Assignment |
| J | Form of Assignment of Residency Agreements and Leases |
| K | Form of FIRPTA Affidavit |
| L | Title Matters |
| M | Rent Roll |
| N | Service Contracts |
| O | List of Employees |
| P | Employment Matters |
| Q | Environmental Reports |
| R | Notice Addresses |

110855143.8

## Exhibit A

## Definitions

"Accepted Service Contracts" shall have the meaning set forth in Section 3.4.

"Accrued Employee Benefits" shall have the meaning set forth in Section 3.5(a).

"Affiliate" shall mean (i) as to Seller: Principals, any entity that directly or indirectly controls, is controlled by, or is under common control with Seller or Principals or any entity at least a ten percent (10%) of whose economic interest is owned, directly or indirectly, by Seller or Principals; and (ii) as to Buyer: James C. Coughlin, Wendy A. Nowokunski, any entity that directly or indirectly controls, is controlled by, or is under common control with Buyer, James C. Coughlin, or Wendy A. Nowokunski, or any entity at least a ten percent (10%) of whose economic interest is owned, directly or indirectly, by Buyer, James C. Coughlin, or Wendy A. Nowokunski; and the term "control" means the power to direct the management of such entity through voting rights, ownership or contractual obligations.

"Agreement" shall have the meaning set forth in the Introductory Paragraph.

"Alternative Transactions" shall mean a transaction or series of related transactions pursuant to which Seller accepts a bid for all or a substantial portion of the Assets or any group of assets that includes all or a substantial portion of the Assets, from a person other than Buyer or an Affiliate of the Buyer, as the highest or best offer, in accordance with the Bidding Procedures Order or otherwise, but does not mean the sale of goods or services conducted in the ordinary course of business.

"Assignment of Residency Agreements" shall have the meaning set forth in Section 5.5(c).

"Assets" shall mean the Real Property and the Personal Property.

"Auction" shall have the meaning set forth in the Bidding Procedures Order.

"Back-Up Bidder" shall have the meaning set forth in the Bidding Procedures Order.

"Bank" shall mean Camden National Bank.

"Bankruptcy Case" shall mean the bankruptcy case to be commenced by Seller under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

"Bankruptcy Code" shall mean title 11 of the United States Code, Sections 101 et seq.

"Bankruptcy Court" shall mean the United States Bankruptcy Court for the District of New Hampshire.

"Bankruptcy Rules" shall mean the Federal Rules of Bankruptcy Procedure.

"Benefit Plan" shall have the meaning set forth in Section 7.1(h).

"Bidding Procedures" shall have the meaning set forth in the Bidding Procedures Order.

"Bidding Procedures Order" shall mean the Order of the Bankruptcy Court approving the Sale Motion and the Bidding Procedures and setting dates for, among other things, the Sale Hearing and the Auction.

"Bid Procedures Motion" shall mean the Motion filed by the Seller seeking approval of the Bidding Procedures and the entry of the Bidding Procedure Order.

"Bill of Sale" shall have the meaning set forth in Section 5.5(b).

"Break-Up Fee" shall have the meaning set forth in Section 8.5(b).

"Buyer" shall have the meaning set forth in the Introductory Paragraph.

"CCRs" shall have the meaning set forth in Section 3.6.

"Claims" shall have the meaning set forth in Section 10.16.

"Closing" shall have the meaning set forth in Section 5.2.

"Closing Date" shall have the meaning set forth in Section 5.2.

"Code" shall have the meaning set forth in Section 7.1(h).

"Competing Project" shall mean, as to the Facility, any Senior Housing Facility located within the non-compete area for the Facility set forth on Exhibit B attached hereto.

"Conditions Precedent" shall have the meaning set forth in Section 5.3.

"consent" shall mean any approval, consent, ratification, waiver, or other authorization; or an order of the Bankruptcy Court that deems, or rendered unnecessary, the same.

"Cure Amounts" shall mean any costs necessary to cure all defaults (as required by Section 365 of the Bankruptcy Code) under each Accepted Service Contract.

"Deed" shall have the meaning set forth in Section 5.5(a).

"Deposit" shall have the meaning set forth in Section 2.1(a).

"Due Diligence Period" shall mean the period expiring on [March 28], 2017.

"Effective Date" shall mean the date that this Agreement has been executed and delivered by all parties hereto.

"Employees" shall have the meaning set forth in Section 7.1(h).

"Encumbrances" shall mean all obligations, mortgages, pledges, charges, liens, debentures, trust deeds, claims (choate or inchoate), assignments by way of security or otherwise, security

Exhibit A-2

interests, conditional sales contracts or other title retention agreements or similar interests or instruments charging, or creating a security interest in the Assets or any part thereof or interest therein, and any agreements, leases, licenses, occupancy agreements, options, easements, rights of way, restrictions, executions or other encumbrances (including notices or other registrations in respect of any of the foregoing) affecting title to the Assets or any part thereof or interest therein, except for matters approved by Buyer in writing.

"Environmental Laws" shall mean all applicable federal, state, county, municipal and other local laws governing or relating to Hazardous Materials or the environment, together with their implementing regulations, ordinances and guidelines, including without limitation, the Resource Conservation and Recovery Act and the Comprehensive Environmental Response Compensation and Liability Act.

"Environmental Reports" shall have the meaning set forth in Section 7.1(k).

"Escrow Agent" shall mean the Title Company.

"Escrow Demand" shall have the meaning set forth in Section 2.3.

"ERISA" shall have the meaning set forth in Section 7.1(h).

"Excluded Service Contracts" shall have the meaning set forth in Section 3.4.

"Extension Payment" shall have the meaning set forth in Section 5.2.

"Facility" shall mean the Senior Housing Facility operated by Seller set forth on Exhibit B attached hereto.

"FDIC" shall have the meaning set forth in Section 2.2(c).

"Final Order" shall mean an Order of the Court that has not been reversed, stayed, modified or amended and as to which the time to seek reconsideration, appeal or petition for certiorari has expired and as to which no motion for reconsideration, appeal or petition for certiorari is pending.

"Hazardous Materials" shall mean, without limitation, polychlorinated biphenyls, urea formaldehyde, radon gas, lead paint, radioactive matter, medical waste, asbestos, petroleum products, including crude oil or any fraction thereof, natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel (or mixtures of natural gas or such synthetic gas), and any substance, material, waste, pollutant or contaminant listed or defined as hazardous, infectious or toxic under any applicable federal, state or local law.

"Improvements" shall mean all buildings, improvements, fixtures, structures, parking areas and landscaping located on or appurtenant to the Land.

"Initial Deposit" shall have the meaning set forth in Section 2.1(a).

"Intangible Property" shall mean all right, title and interest of Seller in and to all intangible personal property owned by Seller and now or hereafter used in connection with the operation, ownership, maintenance, management, or occupancy of the Facility, including, without limitation, any and all of the following: trade names and trademarks associated with the Facility, including, without limitation, the name "*Sanctuary at Rye*" and the trade names set forth on Exhibit B attached hereto; web sites, domain names, and web addresses; the plans and specifications for the Improvements, including as-built plans; warranties, guarantees, indemnities and claims against third parties benefiting Seller; contract rights related to the construction, operation, repair, renovation, ownership or management of the Facility; pending permit or approval applications as well as existing permits, approvals and licenses (to the extent assignable); insurance proceeds and condemnation awards to the extent provided in Sections 4.2 or 4.3 of this Agreement; and books and records relating to the Facility.

"Land" shall mean the land described in Exhibit D attached hereto and all and singular the rights, benefits, privileges, easements, tenements, hereditaments, and appurtenances thereon or in anywise appertaining to such land, including any and all mineral rights, development rights, water rights and the like; and all right, title, and interest of Seller in and to all strips and gores and any land lying in the bed of any street, road or alley, open or proposed, adjoining such land.

"Lease" shall mean and refer to any lease, license or other agreement other than residency agreements, pursuant to which any person or entity has the right to occupy or use the Real Property or any portion thereof.

"Liability" shall mean with respect to any person, any liability or obligation of such person of any kind or nature, debts, losses, damage, demand, fine, judgment, penalty, adverse claims, fee, assessment, duty, charge, deficiency, commitments, responsibilities, Taxes, whether known or unknown, absolute or contingent, accrued or unaccrued, matured or unmatured, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, executory, determined, determinable, or otherwise, and whether or not the same is required to be accrued on the financial statements of such person, including those arising under any law or action and those arising under any contract, agreement, arrangement, commitment or undertaking, or otherwise, including any Tax liability or tort liability.

"Lists" shall have the meaning set forth in Section 7.1(n).

"Material damage" and "materially damaged" shall have the meanings set forth in Section 4.2.

"Monetary Lien" shall have the meaning set forth in Section 3.4(a).

"Non-Debtor Subsidiary" shall mean an officially formed and active subsidiary of the Debtor that is not a "Debtor" under the Bankruptcy Code.

"Non-Solicitation Period" shall have the meaning set forth in Section 4.1(b).

"Notified Party" shall have the meaning set forth in Section 2.3.

"Notifying Party" shall have the meaning set forth in Section 2.3.

Exhibit A-4

"OFAC"  shall have the meaning set forth in Section 7.1(m).

"Order" and "Orders"  shall have the meanings set forth in Section 7.1(m).

"Permitted Exceptions" shall mean:  (i) title and survey exceptions approved by Buyer pursuant to Section 3.3 of this Agreement; (ii) provisions of existing building and zoning laws, provided the same continue to permit the Land to be used as a Senior Housing Facility as presently operated without necessity of any additional special permit, variance or other discretionary permit or approval; (iii) any liens for municipal betterments assessed after the date of this Agreement; (iv) existing rights and obligations in party walls which are not the subject of written agreement; (v) such taxes for the then current year as are not due and payable on the Closing Date; and (vi) parties in possession of individual senior housing units as residents only.

"Permits" shall have the meaning set forth in Section 7.1(j).

"Permitted Personal Property Liens" shall mean, for the Assets (i) leases, license rights or restrictions incurred in the ordinary course of business which do not in any case materially detract from the value of the property subject thereto; (ii) pledges or deposits in connection with workers' compensation, unemployment insurance and other social security legislation and deposits securing liability to insurance carriers under self-insurance arrangements; (iii) deposits to secure the performance of bids, trade contracts (other than for borrowed money), leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business; and (iv) purchase money security interest in respect of new equipment in an aggregate amount not in excess of $50,000 at any time.

"person" shall mean any individual, corporation (including any nonprofit corporation), general or limited partnership, limited liability company, joint venture, estate, trust, association, organization, labor union or other entity or governmental body.

"Personal Property" shall mean all Tangible Personal Property and Intangible Personal Property.

"Petition Date" shall mean the date of the filing of the Chapter 11 petition of Seller.

"Principals" shall mean, individually and collectively, Jonathan McCoy and Scott Kingsley.

"Purchase Price" shall mean, subject to adjustments and prorations as set forth herein, the sum of Nine Million Six Hundred Fifty Thousand and 00/100 Dollars ($9,650,000.00).

"Qualified Bid" shall have the meaning set forth in the Bidding Procedures Order.

"Real Property" shall mean the Land and the Improvements.

"Releasees" shall have the meaning set forth in Section 10.16.

"Rent Roll" shall have the meaning set forth in Section 7.1(f).

"Rents" shall mean all rental income from the Real Property, including without limitation, base rent and additional rent or fees paid by residents pursuant to the Residency Agreements.

110855143.8

"Residency Agreements" shall mean all residency agreements or other occupancy agreements between Seller or its agents and any other person or entity with respect to the Facility.

"Sale Motion" shall mean the motion that will be filed with the Bankruptcy Court to seek approval of the transaction contemplated hereby.

"Sale Hearing" shall have the meaning set forth in the Bidding Procedures Order.

"Sale Order" shall mean the Order approving this Transaction and the Buyer, containing all of the terms set forth in Section 5.3. The Sale Order shall be entered after the Sale Hearing.

"Seller" shall have the meaning set forth in the Introductory Paragraph.

"Seller Deliverables" shall have the meaning set forth in Section 3.1.

"Seller Representative" shall have the meaning set forth in Section 4.1(b).

"Senior Housing Facility" shall mean a facility which provides any one or more of the following types of senior housing: assisted living for seniors or Alzheimer's/memory care for seniors.

"Service Contracts" shall mean (i) all service and systems contracts and other contracts, agreements or instruments relating to the use, operation, maintenance or management of the Facility and (ii) all non-residential leases, included vehicle leases.

"Successful Bidder" any party who acquires all or substantially all of the Assets (in a single transaction or a series of transactions) or all or substantially all of the equity interests (in a single transaction or a series of transactions) of Seller or any of its successors by reason of having submitted the successful bid at the Auction in a manner consistent with and authorized by the Bidding Procedures Order, regardless of whether such party has acquired such assets or equity interests for investment, strategic operation, liquidation, or other purpose; provided any initial overbid by any other bidder (other than Buyer) must be in an amount equal to or greater than the Break-Up Fee plus $50,000.

"Survey" shall have the meaning set forth in Section 3.3.

"Tangible Personal Property" shall mean all right, title and interest of Seller in and to all tangible personal property now or hereafter used in connection with the use, operation, maintenance or management of the Real Property, including, without limitation, the motor vehicles listed on Exhibit F attached hereto (the "Vehicles"), all tools, equipment, machinery, heating, ventilating and air conditioning units, furniture, art work, furnishings, trade fixtures, office equipment and supplies.

"Taxes" shall have the meaning set forth in Section 6.1(a).

"Title Commitment" shall have the meaning set forth in Section 3.3.

"Title Company" shall mean Stewart Title Guaranty Company.

110855143.8

## Exhibit B

## Property Information

| Facility/Address | Tradename | Units |
|---|---|---|
| Sanctuary at Rye, 295 Lafayette Rd., Rye, New Hampshire 03842 | Sanctuary at Rye | 56 |

NON-COMPETE AREA

[DESCRIPTION OF ADJACENT PARCEL TO BE ADDED]

Exhibit B-1

**Exhibit C**

**Personal Property Owned by Seller**

Exhibit C-1

110855143.8

**Exhibit D**

**Description of Land**

A certain tract or parcel of land, with the buildings and improvements thereon, situated in the Town of Rye, County of Rockingham and State of New Hampshire, and bounded and described as follows:

Beginning at a point on the westerly side of US Route 1, Lafayette Road, at the northeasterly corner of land now or formerly of Malcolm E. Smith III; thence N 82° 28' 17" W for a distance of 135.00 feet to a point; thence S 44° 30' 59" W for a distance of 60.89 feet to a point; thence N 82° 28' 17" W for a distance of 503.54 feet to a point; thence N 37° 03' 37" E for a distance of 55.87 feet to a point; thence N 36° 38' 12" E for a distance of 377.50 feet to a point; thence S 89° 28' 56" E for a distance of 69.57 feet to a point; thence N 89° 00' 53" E for a distance of 147.78 feet to a point; thence N 88° 00' 58" E for a distance of 121.91 feet to a point; thence N 87° 48' 51" E for a distance of 278.70 feet to a point on the westerly side of Lafayette Road; thence along the westerly sideline of Lafayette Road S 26° 24' 32" W for a distance of 180.67 to a point; thence S 26° 24' 32" W for a distance of 270.97 to the point of beginning.

Meaning and intending to describe a 5.815 acre parcel as shown on a plan entitled "Boundary Line Adjustment & Merger Plan for Rye Sanctuary", by Doucet Survey, dated January 12, 2010, and recorded at the Rockingham County Registry of Deeds as Plan #D-36366.

Exhibit D-1

110855143.8

## **Exhibit E**

Intentionally Omitted

110855143.8

**Exhibit F**

**Schedule of Vehicles**

| Year/Model | Leased[1]/ Owned | Outstanding Loan Balance (as of _____, 20__) | Monthly Payment Due | Maturity Date |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

---

[1] The leased vehicles that are part of the "Excluded Service Contracts" should be noted as such on this schedule.

Exhibit F-1

## Exhibit G

## Seller Deliverables

1. All title insurance policies or other evidence of title, together with copies of all encumbrances, easements and restrictions and other matters referenced therein or otherwise affecting the property.

2. Current ALTA survey.

3. Copies of real estate tax bills and other municipal, county, state or other assessments for current and up to two prior years.

4. Evidence of connection and operating of all gas, water, electric, sewer and other utility services (may be shown of survey). Copies of utility invoices for prior twelve months.

5. All building and occupancy permits and licenses and all other governmental permits, licenses and approvals and notices of violation. This should include zoning opinions and other evidence of compliance with zoning (use, building dimensions, parking, loading and access), variances, special permits, site plan approvals, subdivision, building code, wetlands, curb cuts, historic regulations, environmental and similar land use laws and regulations as well as operational licenses for the facility.

6. All plans and specifications prepared in connection with the property including as-built plans, site plans, floor plans and model unit plans.

7. All leases, license agreements or similar agreements for use and occupancy allowing any lessees or third parties to use or occupy any portion of the property, together with all amendments, notices, estoppel certificates or agreements or documentation regarding security deposits.

8. All environmental reports on the property, including Phase I reports, Phase II reports; repairs re:  air quality, asbestos, lead; all logs of borings and testing wells and test results on the property.  Any notices, citations or correspondence to or from the DEP, DEQE, local, state or national agencies; all environmental opinions on the property.

9. Roof study and any other engineering or structural studies performed on the property over the past five (5) years.

10. Any existing geotechnical, engineering, ADA or other reports or documentation regarding the status of the land and structures and the mechanical, electrical, utility and other building systems.

11. A list of all personal property and equipment used in the operation and management of the property and included in the sale, including all on site vehicles.

12. All management contracts or other service agreements regarding maintenance or operation of the property.  Agreements to include:  elevator maintenance, landscaping,

Exhibit G-1

snow removal, fire alarm systems, and all other service agreements or contracts related to the property.

13.   Copies of all warranties of guarantees for HVAC, roof, elevators and equipment.

14.   Aerial photographs (if available).

15.   List of all outstanding litigation.

Financial Due Diligence

16.   Current Rent Roll, including prepaid rent and security/last month's rent deposits.

17.   Current listing of ancillary revenue utilization and charges by unit/resident.

18.   Lease expiration report.

19.   Current year capital budget.

20.   Capital expenditure recap for last two years.

21.   Current operating budgets broken down by month, including detailed staffing schedules.

22.   Current month and prior 12 months detailed internal operating statements.

23.   Staffing patterns by month for past two years including hours by position, wages by position and wage totals.

Operations Due Diligence

24.   Standard form and all residency agreements including any modifications, addendum's attachments and Resident Handbooks or House Rules.

25.   Incident reports for the prior one year.

26.   Outline of existing benefits for all associates (including health, vacation, 401k etc.).

27.   Current site organizational chart and job descriptions.

28.   Property Bonus Program.

29.   Prior two years inspection reports and correspondence from licensing agencies; including department of health, state licensing/certification and all other regulatory agencies.

30.   All service agreements related to the operations, including but not limited to pharmacy, beauty shop, transfer, and medical services.

Information Systems

Exhibit G-2

31.   An inventory of computers, hardware, software applications per community and home office.

32.   Outline payroll process to include pay periods, process, vendors, inventory of time clocks, etc.

<u>Marketing & Sales</u>

33.   All marketing materials including collaterals, schedule of fees, current and past one-year ads, brochures, newsletters, direct mailings and disclosure statements.

34.   Financial and medical criteria for move-in.

35.   24-month occupancy trend on a monthly basis or from opening to the present, itemized by unit type (i.e. IL, AL).

36.   Market feasibility studies; demographics, target markets, etc.

37.   One complete collateral kit per project.

38.   New resident move in packet; lease, forms, handbooks, etc.

<u>Insurance Due Diligence</u>

39.   General and Professional Liability Long Term Care Applications for various insurers, completed for each location.

40.   Statement of property values by location.

41.   Construction, protection and exposure information by property.

42.   Vehicle schedule.

43.   Driver schedule.

44.   Workers Compensation remuneration, by location, by classification.

45.   Copy of the most recent Workers Compensation experience modification and accompanying worksheets.

46.   Detailed descriptions of all open and closed claims over $25,000 in the last five years (minimum).

47.   Most recent State Surveys including re-visits and compliance letters.

48.   Admission Material and Agreements.

49.   Copy of all Licenses.

Exhibit G-3

110855143.8

50.     Contracts with Vendors.

51.     Copy of Safety Program.

<u>Passcodes</u>

52.     All passcodes to social media accounts and the like.

110855143.8

## **Exhibit H**

## **EXCEPTIONS TO NON-COMPETE**

110855143.8

**Exhibit I**

**BILL OF SALE AND GENERAL ASSIGNMENT**

       THIS BILL OF SALE AND GENERAL ASSIGNMENT (this "Assignment") is made as of the ____ day of _____, 20____ (the "Transfer Date"), by and between _____, a _____ ("Assignor"), and _____, a _____ ("Assignee").

       A.     Assignor and certain affiliates thereof, as seller, and [NBR Acquisition Rye, LLC] ("Northbridge"), as buyer, entered into that certain Purchase and Sale Agreement dated as of _____, 20____ (the "Purchase Agreement") in connection with, inter alia, that certain senior housing facility commonly known as _____, located in _____ (the "Facility").

       B.     Northbridge's rights under the Purchase Agreement with respect to the Facility have been assigned to Assignee pursuant to an assignment agreement by and between Northbridge and Assignee of even date herewith.

       C.     Pursuant to the Purchase Agreement, Assignor has agreed to assign, transfer and convey all of its rights, title and interest in, to and under the Personal Property with respect to the Facility to Assignee.

       D.     Pursuant to the Purchase Agreement, Assignor has agreed to assign, and Assignee agreed to assume, all of Assignor's rights, title, interest, obligations and liabilities in, to and under the contracts and agreements with respect to the Facility set forth on Exhibit B attached hereto (collectively, the "Contracts").

AGREEMENT

       NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

       1.     Personal Property.  Assignor hereby sells, assigns, transfers and conveys unto Assignee all of Assignor's rights, title and interest in, to and under all Personal Property, including, without limitation, (i) all trade names and trademarks associated with the Facility, including, without limitation, the name "_____" and the trade names set forth in Exhibit B to the Purchase Agreement, and (ii) all vehicles and equipment listed on Exhibit A attached hereto, subject only to the Permitted Personal Property Liens, as is, where is and without warranty, express or implied, of merchantability or fitness for a particular purpose, except as set forth in the Purchase Agreement, TO HAVE AND TO HOLD all of said Personal Property unto Assignee, its successors and assigns, to its own use forever.

       2.     Assignment of Contracts.  Assignor hereby assigns to Assignee all of Assignor's rights, title and interests in, to and under the Contracts, and Assignee hereby assumes Assignor's obligations under the Contracts accruing on or after the Transfer Date.

Exhibit I-1

3. <u>Indemnity by Assignor</u>. Assignor agrees to indemnify, defend and hold Assignee harmless from and against any and all losses, costs, claims, damages, liabilities and expenses, including, without limitation, reasonable attorneys' fees and expenses, accruing prior to the Transfer Date relating to the Personal Property or the Contracts.

4. <u>Indemnity of Assignee</u>. Assignee agrees to indemnify, defend and hold Assignor harmless from and against any and all losses, costs, claims, damages, liabilities and expenses, including, without limitation, reasonable attorneys' fees and expenses, accruing on or after the Transfer Date relating to the Personal Property or the Contracts.

5. <u>Prevailing Party</u>. In the event of any legal or equitable proceeding to enforce any of the terms or conditions of this Assignment, or any alleged disputes, breaches, defaults or misrepresentations in connection with any provision of this Assignment, the prevailing party in such proceeding shall be entitled to recover its reasonable costs and expenses, including, without limitation, reasonable attorneys' fees and costs of defense paid or incurred in good faith.

6. <u>Binding Effect</u>. This Assignment shall inure to the benefit of and be binding upon the parties hereto and their respective permitted successors and assigns.

7. <u>Severability</u>. If any provision of this Assignment as applied to either party or to any circumstance shall be adjudged by a court of competent jurisdiction to be void or unenforceable for any reason, the same shall in no way affect (to the maximum extent permissible by law) any other provision of this Assignment, the application of any such provision under circumstances different from those adjudicated by the court, or the validity or enforceability of this Assignment as a whole.

8. <u>Counterparts</u>. This Assignment may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Signature pages may be detached from the counterparts and attached to a single copy of this Assignment to physically form one document.

9. <u>Definitions</u>. Capitalized terms used and not otherwise defined herein shall have the meanings given to such terms in the Purchase Agreement.

Exhibit I-2

IN WITNESS WHEREOF, the parties have executed this Assignment as of the _____ day of _____, 20___.

**ASSIGNOR:**

_____, a
_____

By: _____, a
   _____

   By: _____
      Name:
      Title:

**ASSIGNEE:**

_____, a
_____ limited liability company

By: _____
   Name:
   Title:

Exhibit I-3

**Exhibit J**

**ASSIGNMENT AND ASSUMPTION OF LEASES AND
RESIDENCY AGREEMENTS**

THIS ASSIGNMENT AND ASSUMPTION OF LEASES AND RESIDENCY AGREEMENTS (this "Assignment") is made as of the ___ day of _____, 20___ (the "Transfer Date"), by and between _____, a _____ ("Assignor"), and _____, a _____ limited liability company ("Assignee").

A.  Assignor and certain affiliates thereof, as seller, and [NBR Acquisition Rye], LLC ("Northbridge"), as buyer, entered into that certain Purchase and Sale Agreement dated as of _____, 20___ (the "Purchase Agreement") in connection with, inter alia, that certain senior housing facility commonly known as _____, located in _____ (the "Facility").

B.  Northbridge's rights under the Purchase Agreement with respect to the Facility have been assigned to Assignee pursuant to an assignment agreement by and between Northbridge and Assignee of even date herewith.

C.  Pursuant to the Purchase Agreement, Assignee has agreed to assign, and Assignee has agreed to assume, all of Assignor's rights, title, interest, obligations and liabilities in, to and under the leases and residency agreements in connection with the Facility set forth on Exhibit A attached hereto (collectively, the "Residency Agreements").

AGREEMENT

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee hereby agree as follows:

1.  Assignment.  Assignor hereby assigns, transfers, sets over and conveys to Assignee all of Assignor's rights, title and interest in, to and under the Residency Agreements accruing from and after the Transfer Date, including, without limitation, all security deposits and prepaid rent with respect thereto.

2.  Assumption.  Assignee hereby assumes and agrees to perform all of Assignor's obligations under the Residency Agreements accruing from and after the Transfer Date.

3.  Indemnity by Assignor.  Assignor agrees to indemnify, defend and hold Assignee harmless from and against any and all losses, costs, claims, damages, liabilities and expenses, including, without limitation, reasonable attorneys' fees and expenses, accruing prior to the Transfer Date relating to the Residency Agreements.

4.  Indemnity of Assignee.  Assignee agrees to indemnify, defend and hold Assignor harmless from and against any and all losses, costs, claims, damages, liabilities and expenses, including, without limitation, reasonable attorneys' fees and expenses, accruing on or after the Transfer Date relating to the Residency Agreements.

5.     <u>Prevailing Party</u>.  In the event of any legal or equitable proceeding to enforce any of the terms or conditions of this Assignment, or any alleged disputes, breaches, defaults or misrepresentations in connection with any provision of this Assignment, the prevailing party in such proceeding shall be entitled to recover its reasonable costs and expenses, including, without limitation, reasonable attorneys' fees and costs of defense paid or incurred in good faith.

6.     <u>Binding Effect</u>.  This Assignment shall inure to the benefit of and be binding upon the parties hereto and their respective permitted successors and assigns.

7.     <u>Severability</u>.  If any provision of this Assignment as applied to either party or to any circumstance shall be adjudged by a court of competent jurisdiction to be void or unenforceable for any reason, the same shall in no way affect (to the maximum extent permissible by law) any other provision of this Assignment, the application of any such provision under circumstances different from those adjudicated by the court, or the validity or enforceability of this Assignment as a whole.

8.     <u>Counterparts</u>.  This Assignment may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Signature pages may be detached from the counterparts and attached to a single copy of this Assignment to physically form one document.

9.     <u>Definitions</u>.  Capitalized terms used and not otherwise defined herein shall have the meanings given to such terms in the Purchase Agreement.

IN WITNESS WHEREOF, Assignor and Assignee have each executed this Assignment as of the date first written above as a sealed instrument.

ASSIGNOR:     _____, a
              _____

              By:     _____
                      Name:_____
                      Title:_____

ASSIGNEE:     _____, a
              _____ limited liability company

              By:     _____
                      Name:_____
                      Title:_____

Exhibit J-2

**Exhibit K**

**FIRPTA Affidavit**

Section 1445 of the Internal Revenue Code of 1986, as amended, provides that a transferee of a United States real property interest must withhold tax if the transferor is a foreign person.  To inform the Transferee (hereinafter defined) that withholding of tax is not required upon the disposition of a United States real property interest by _____, a _____ (the "<u>Transferor</u>") to _____, a _____ (the "<u>Transferee</u>"), the undersigned, being first duly sworn upon oath, does hereby depose and say, and does hereby certify the following on behalf of the Transferor:

1.    The undersigned is the _____ of the Transferor and is familiar with the business of the Transferor;

2.    The Transferor is not a foreign person; that is, the Transferor is not a nonresident alien, a foreign corporation, foreign partnership, foreign trust or foreign estate (as all such terms are defined in the Internal Revenue Code of 1986, as amended, and United States Treasury Department Income Tax Regulations in effect as of the date hereof);

3.    The Transferor is a corporation duly organized, validly existing and in good standing under the laws of the State of _____;

4.    The Transferor's United States employer identification number is _____;

5.    The Transferor's office address and principal place of business is _____; and

6.    This certificate and affidavit is made to induce the Transferee to consummate the transactions contemplated by the Transferor and Transferee.

The Transferor understands that this affidavit and certification may be disclosed to the United States Internal Revenue Service by the Transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under penalties of perjury, the undersigned declares that he has examined this affidavit and certificate, and to the best of the undersigned's knowledge and belief, it is true, correct and complete.  The undersigned further declares that he has authority to sign this affidavit and certificate on behalf of the Transferor.

Exhibit K-1

This affidavit and certificate is executed and delivered as of the ____ day of _____, 20____.

                                        _____,

a _____

By:     _____

            Name:

            Title:

STATE OF _____ )
                          ) SS.
COUNTY OF          )

       I, _____, a notary public in and for said County, in the State aforesaid, DO HEREBY CERTIFY that _____ personally known to me to be the _____ of _____, a _____, and personally known to me to be the same person whose name is subscribed to the foregoing instrument, appeared before me this day in person and acknowledged that as such _____, he/she signed and delivered the said instrument, pursuant to authority, given by the Board of Directors of said corporation as his/her free and voluntary act, and as the free and voluntary act of said corporation, for the uses and purposes herein set forth.

       GIVEN under my hand and official seal this _____ day of _____, 20___.

               Notary Public

               _____

               My Commission Expires:_____

Exhibit K-2

**Exhibit L**

**Title Matters**

Exhibit L-1

**Exhibit M**

**Rent Roll**

**Exhibit N**

**Service Contracts**

110855143.8

## **Exhibit O**

## **List of Employees**

**Exhibit P**

**Employment Matters**

**Exhibit Q**

**List of Environmental Reports**

110855143.8

## Exhibit R

### Notice Addresses

(a)     Seller:                                              With a copy to:


Camden National Bank
c/o Jeremy R. Fischer, Esq.
84 Marginal Way, Suite 600
Portland, ME 04101-2480
Phone: 207 772-1941
Fax: 207 772-3627
Email: jfischer@dwmlaw.com




(b)     Buyer:                                              With a copy to:

NBR Acquisition Rye, LLC                            Carlton Fields
15 Third Avenue                                    One State Street, Suite 1800
Burlington, MA 01803                               Hartford, CT 06103
Attn:  James C. Coughlin, Managing Member          Attn:  Frank A. Appicelli, Esq.
Phone:  (781) 238-4851                             Phone:  860-392-5015
Fax:  (781) 272-0846                               Fax:  860-392-5058
Email:  jim@northbridgecos.com                     Email:  fappicelli@carltonfields.com

(c)     Escrow Agent and Title Company:

Stewart Title Guaranty Company
1 Washington Mall – Suite 1400
Boston, MA  02108

Attn:  Joseph P. Sullivan
Phone:  617-933-2425
Fax:  617-737-8370
Email:  joseph.sullivan@stewart.com