UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| In re:<br><br>Sanctuary Care, LLC, and<br>Sanctuary at Rye Operations, LLC,<br><br>Debtors | CHAPTER 11<br><br>Case Number 17-10591<br>Case Number 17-10590<br>Joint Administration Motion<br>Pending |

### DEBTOR'S MOTION FOR INTERIM AND FINAL AUTHORITY TO USE CASH COLLATERAL

The debtors-in-possession in the above jointly administered cases, Sanctuary Care, LLC ("SC") and Sanctuary at Rye Operations, LLC ("SRO," and together with SC, the "Debtor") respectfully move, pursuant to sections 363(c)(2)(B), 105(a), 361, 362, 506, 507, and 552 of title 11 of the United States Code (the "Bankruptcy Code"), and Rule 4001(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and LBR 4001-2, for an order authorizing (a) the limited interim use of cash collateral to avoid immediate and irreparable harm pending a final hearing at least 14 days, but not more than 30 days, after the filing of this Motion, (b) the use of cash collateral on a final basis through a closing on the sale of substantially all of the Debtor's assets, which must occur before June 15, 2017 (the "Use Period"), and (c) the Debtor to provide Camden National Bank (the "Senior Lender") and the New Hampshire Community Loan Fund (the "Subordinated Lender," and together with the Senior Lender, the "Lenders") with adequate protection and other protections described herein.

1

Accompanying this Motion is a supporting affidavit of Alice Katz of the Vinca Group, as the Debtor's chief restructuring officer (the "CRO"), as required by LBR 4001-2(b). In further support of this Motion the Debtor hereby states as follows:

**SUMMARY REQUIRED BY BANKRUPTCY RULE 4001(b)(1)(B) AND LBR 4001-2**

Pursuant to Bankruptcy Rule 4001(b)(1)(B) and LBR 4001-2, the Debtor provides the following concise statement of the relief requested by this Motion.

The Senior Lender holds senior liens on the Debtor's cash collateral and the Subordinated Lender holds junior liens on the cash collateral. Based on the Debtor's review of the summary report obtained from the New Hampshire Secretary of State's office (the "NHSOS Office"), no other creditor holds liens on the cash collateral. The Senior Lender has consented to the relief requested by this Motion pursuant to Bankruptcy Code section 363(c)(2)(A), subject to the Senior Lender receiving the protections provided herein. The Subordinated Lender has not yet consented to the relief requested herein; however, to the extent that the Subordinated Lender refuses to consent, the Debtor believes that cause exists for this Court to authorize the use of cash collateral pursuant to section 363(c)(2)(B) after notice and a hearing.

The Debtor requests authority to use cash collateral until a final hearing to avoid immediate and irreparable harm pursuant to Bankruptcy Rule 4001(b)(2). The Debtor further requests that the Court schedule a final hearing on this Motion in not less than 14 days, and not more than 30 days, pursuant to Bankruptcy Rule 4001(b)(2) and LBR 4001-2(e), and that the Court authorize the use of cash collateral on a final basis following that hearing.

As shown on the budget attached as **Exhibit A** (the "Budget"), use of the cash collateral on an interim and final basis is necessary through the Use Period to: (1) make payroll to Debtor's employees essential to its continued operations; (2) pay insurance premiums as necessary to ensure

continuation of the necessary insurance coverage; (3) pay vendors, suppliers and utilities for ongoing supplies and services; (4) pay other ordinary and necessary expenses to prevent an immediate cessation of the business; and (5) pay the Debtor's professionals and the fees of the United States Trustee. Even with the use of cash collateral, the Debtor will need additional borrowing from the Senior Lender to fund their operational shortfalls. Therefore, the Debtor has also filed a motion with the Court requesting authority to borrow from the Senior Lender.

The Debtor proposes to provide the Lenders with adequate protection in the form of replacement liens on all cash collateral acquired by the Debtor after the petition date pursuant to Bankruptcy Code sections 361(2) and 552(b). The replacement liens will have the same priority as the Lenders' pre-petition liens. The Debtor also proposes to provide the Lenders with weekly financial reporting, comparing the revenues and expenses projected in the Budget to actual results, along with other financial reporting requested by the Lenders. The Debtor will provide copies of the reporting to the United States Trustee and, if appointed, to any official committee of unsecured creditors.

Additionally, as to the Senior Lender, the Debtor proposes to provide additional protections that are justified by the Senior Lender's pre-petition and post-petition support of that has enabled the Debtor to protect the health and safety of its elderly residents, pay salary and benefits to employees, remain current on payments to vendors, and facilitate a going concern sale to maximize value for the estates. Specifically, between August 2016 and the petition date, the Senior Lender loaned the Debtor approximately $450,000 to fund operational shortfalls. Post-petition, the Senior Lender has agreed to advance up to $500,000 of additional financing to pursuant to the DIP Credit Agreement pending before this Court, again to fund shortfalls that cannot be paid using cash generated by the Debtor's business operations. Finally, the Senior Lender has agreed to fund "stay

bonuses" for certain of the Debtor's key employees in the discretion of the CRO to facilitate an orderly transition of the Debtor's assets to a purchaser of substantially all of the Debtor's assets on or before June 15, 2017. In recognition of this support, the Debtor has agreed to the following additional protections for the Senior Lender in the final order granting this Motion: (1) an acknowledgement of the validity, perfection, and priority of the Senior Lender's pre-petition liens and the amount of the indebtedness owed to the Senior Lender; (2) waiver of the estates' right to seek to surcharge the Senior Lender's collateral pursuant to Bankruptcy Code section 506(c), beyond the amounts described in the Budget; and (3) a general release of any claims or causes of action that the Debtor may have against the Senior Lender. Under the circumstances of these cases, the Debtor submits that this additional protection is warranted without an extended investigation period for parties in interest.

**JURISDICTION AND VENUE**

1. The United States District Court for the District of New Hampshire (the "District Court") has original but not exclusive jurisdiction over these chapter 11 cases pursuant to 28 U.S.C. § 1334(a) and over this Motion pursuant to 28 U.S.C. § 1334(b). Pursuant to 28 U.S.C.§ 157(a) and Rule 77.4 of the District Court's local rules, the District Court has authority to refer and has referred these chapter 11 cases and this Motion to this Court.

2. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(M) and the Court has constitutional authority to enter final judgements in this proceeding.

3. Venue of these cases and this proceeding is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

4. No trustee or examiner has been appointed in Debtor's cases and no official statutory committee has yet been appointed.

**FACTUAL BACKGROUND**

5.     SC was created in 2007 for the purpose of developing a memory care assisted living facility. SC owns the land and buildings at 295 Lafayette Road in Rye, New Hampshire (the "Rye Property"). SRO is an operating company that was created in 2010. It is wholly owned by SC. SRO's assisted care program is designed to address the social, spiritual and cognitive needs of its residents. Its mission is to offer people who need memory care independence, nurturing, and loving care to live their lives with dignity in a safe and secure setting.

6.     As described more fully in the Debtor's functional equivalent of a disclosure statement which accompanies their sale papers, the Debtor has not been able to meet its monthly expenses consistently, often needing to use funding from the Senior Lender to cover shortfalls. Due to substantial losses and excessive secured debt, the Debtor concluded that it would be unable to grow its business enough to pay creditors from revenue even over an extended period of time. In fact, the Debtor has not serviced its secured indebtedness in well over a year, although they have generally paid most unsecured creditors with the proceeds of the shortfall lending they received from the Senior Lender.

7.     Additionally, under the CRO's direction and utilizing the CRO's extensive industry connections, the Debtor sought to find a buyer for the business of the Debtor. The Debtor received multiple expressions of interest from third parties, but despite the best efforts of the Debtor, the CRO, and their legal counsel, none of the potential sale transactions came to fruition. However, on March 8, 2017, the Debtor entered into an Asset Purchase Agreement (the "APA") with NBR Acquisition Rye, LLC (the "Buyer"), an entity unrelated to the Debtor, for the sale of substantially all of the assets of the Debtor (the "Assets") for the sum of $9,650,000.

8. The Debtor filed these cases primarily for the purpose of facilitating an orderly sale of the Assets pursuant to the APA for the best possible price to an entity that will be able to provide quality care to the Debtor's patients. The Debtor continues to operate and conduct its business of caring and housing 35 patients with memory challenges.

**PREPETITION SECURED DEBT, PLEDGED ASSETS, AND CASH COLLATERAL**

9. The Debtor is indebted to the Senior Lender pursuant to a commercial promissory note dated December 11, 2014 in the original principal sum of $12 million (the "Senior Note"). The outstanding balance under the Senior Note is $12,703,907.01 as of April 18, 2017, with $3,127.34 accruing daily. The outstanding balance reflected here does not include additional amounts due to the Senior Lender including collection costs, future advances (including protective advances), and amounts that continue to accrue under the loan documents.

10. To secure the obligations under the Senior Note, the Senior Lender holds a first priority security interests and liens on all of the assets of the Debtor, including without limitation, the Debtor's cash collateral. The following documents Evidence the Senior Lender's security interests and liens:

> A. The Commercial Security Agreement between the Senior Lender and SC dated December 11, 2014 granting the Senior Lender a security interest in all personal property assets of SC. The Senior Lender filed a financing statement with the NHSOS Office to perfect its security interests bearing filing number 1412191102090 and recorded in the Rockingham County Registry of Deeds (the "Registry") in Book 5581, Page 1467.
>
> B. The First Mortgage and Security Agreement dated December 11, 2014 from SC to the Senior Lender relating to the Rye Property. The Senior Lender recorded this mortgage in the Registry in Book 5581, Page 1451.
>
> C. The Collateral Assignment of Leases and Rents dated December 11, 2014 from SC to the Senior Lender. The Senior Lender recorded this assignment in the Registry in Book 5581, Page 1475.

    D. The Commercial Security Agreement dated December 11, 2014 between SRO and the Senior Lender granting the Senior Lender a security interest in all the personal property assets of SRO. The Senior Lender filed a financing statement with the NHSOS Office to perfect its security interests bearing filing number 1412191102101 and in the Registry in Book 5581, Page 1555.

    E. The First Leasehold Mortgage and Security Agreement dated December 11, 2014 between SRO and the Senior Lender relating to the Rye Property. The Senior Lender recorded this mortgage in the Registry in Book 5581, Page 1519.

    F. The Collateral Assignment of Leases and Rents dated December 11, 2014 from SRO to the Senior Lender. The Senior Lender recorded this assignment in the Registry in Book 5581, Page 1555.

11. The Debtor is also indebted to the Subordinate Lender pursuant to a certain $3.85 million promissory note and guaranty agreement dated as of December 11, 2014 (the "<u>Subordinated Note</u>"). The outstanding balance under the Subordinated Note is $3,791,698.36 as of April 21, 2017.

12. To secure the obligations under the Subordinated Note, the Subordinated Lender holds second priority security interests and liens on all of the assets of the Debtor, including without limitation, the Debtor's cash collateral. The following documents evidence the Subordinated Lender's security interests:

    A. The Security Agreement between the Subordinated Lender and SC dated December 11, 2014 granting the Subordinated Lender a security interest in all personal property assets of SC. The Subordinated Lender filed a financing statement with the NHSOS Office to perfect its security interests bearing filing number 1412191102050.

    B. The Mortgage and Security Agreement dated December 11, 2014 from SC to the Subordinated Lender relating to the Rye Property. The Subordinated Lender recorded this mortgage in the Registry in Book 5581, Page 1487 and a financing statement with the NHSOS Office to perfect its security interest in all personal property related to the Rye Property bearing filing number 141219110280.

    C. The Security Agreement dated December 11, 2014 between SRO and the Subordinated Lender granting the Subordinated Lender a security interest in all the personal property assets of SRO. The Subordinated Lender filed a financing statement

7

with the NHSOS Office to perfect its security interests bearing filing number 1412191102040.

D. The Leasehold Mortgage, Assignment, Security Agreement and Fixture Filing dated December 11, 2014 between SRO and the Subordinated Lender relating to the Rye Property. The Subordinated Lender recorded this assignment in the Registry in Book 5581, Page 1569 and a financing statement with the NHSOS Office to perfect its security interest in all personal property related to the Rye Property bearing filing number 1412192202060.

13. The Lenders are parties to an intercreditor and subordination agreement memorializing their respective rights and obligations and the priority of their liens and indebtedness.

**RELIEF REQUESTED**

14. By this Motion, the Debtor seeks authority to: (a) use cash collateral on an interim basis pending a final hearing; (b) use cash collateral on a final basis after such hearing throughout the Use Period in the amounts reflected in the Budget; and (c) provide the Lenders with adequate protection on the terms set forth herein.

**BASIS FOR RELIEF REQUESTED**

15. Section 363(a) of the Bankruptcy Code provides the definition of cash collateral. See 11 U.S.C. § 363(a). Cash collateral is defined by section 363 to mean:

> cash, negotiable instruments, documents of title, securities, deposit accounts, or other such cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property . . . subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

16. Pursuant to section 363(c)(1) of the Bankruptcy Code, a debtor is authorized to use property of the estate in the ordinary course of business. This right of a debtor, however, does not extend to cash collateral of a debtor unless either: (a) the party with an interest in the cash collateral

8

consents to its use; or (b) the Court after notice and hearing authorizes its use. *See* 11 U.S.C. 363(c)(2).

17. If a party with an interest in cash collateral does not consent to its use by the debtor, before a court can authorize its use, the debtor must demonstrate that it can adequately protect the interests of the party holding an interest in the cash collateral. *See* 11 U.S.C. § 363(e) ("[T]he court, with or without a hearing, shall prohibit or condition [the use, sale or lease of property under section 363] as is necessary to provide adequate protection of such interest"); *see also Save Power Limited v. Pursuit Athletic Footwear, Inc. (In re Pursuit Athletic Footwear, Inc.)*, 193 B.R. 713, 716 (Bankr. D. Del. 1996); *In re Dynaco Corp.*, 162 B.R. 389, 397 (Bankr. D.N.H. 1993). Adequate protection is a flexible concept that requires a court to make decisions on a case-by-case basis. *In re Harrington & Richardson, Inc.*, 48 B.R. 431, 433 (Bankr. D. Mass. 1985).

18. Various types of adequate protection are available to protect a secured creditor whose cash collateral is used by a debtor section 361 of the Bankruptcy Code. That section envisions adequate protection to be provided either by cash payments, replacement liens, or other relief that will result in the realization by the secured creditor of the indubitable equivalent of the secured creditor's interest in such property. *See In re Issaacson Steel*, 2013 BNH 10, 16 (*citing Baybank-Middlesex v. Ralar Distribs., Inc. (In re Ralar Distribs., Inc.)*, 182 B.R. 81, 85 (D. Mass. 1995)). In each instance, the focus of the Bankruptcy Code is on making sure that any decrease in the value of the collateral during the period involved is adequately protected.

I. **Interim Authority Pending a Final Hearing to Avoid Immediate and Irreparable Harm**

19. Pursuant to Bankruptcy Rule 4001(b)(2):

> The court may commence a final hearing on a motion for

9

>       authorization to use cash collateral no earlier than 14 days after
>       service of the motion. If the motion so requests, the court may
>       conduct a preliminary hearing before such 14 day period expires,
>       but the court may authorize the use of only that amount of cash
>       collateral as is necessary to avoid immediate and irreparable harm
>       to the estate pending a final hearing.

20. Interim use of the cash collateral pending a final hearing on the Motion is essential to avoid immediate and irreparable harm to the Debtor and their estates, residents, and employees. If the Debtor is unable to use cash collateral for the first 14 days of these cases, the Debtor will be unable to pay its ordinary and necessary operating expenses as further described in the Budget. This would cause the Debtor to abruptly cease operations because without these critical supplies and services, including salary and benefits for employees, the Debtor would not be able to maintain a safe and healthy environment for its residents. Among other things, this would likely destroy the going concern value of the Debtor's assets and would constitute a default under the APA.

21. The Debtor, accordingly, requests authority to use cash collateral for the purposes set forth in the Budget pending a final hearing on the Motion. Additionally, the Debtor requests that the Court schedule a final hearing on this Motion as soon as practicable after the expiration of the 14 days period described in Bankruptcy Rule 4001(b)(2), but in no event after the expiration of the 30 day period described LBR 4001-2(e).

## II.  Final Authority Through the Use Period Pursuant to the Budget

22. At the final hearing on this Motion, the Debtor requests authority to use cash collateral for reasonable and ordinary operating expenses, as well as bankruptcy-specific administrative expenses, in the amounts described in the Budget throughout the balance of the Use Period. As set forth in greater detail in the Budget, the Debtor will use cash collateral to: (a) continue operations in terms of housing and caring for its elderly residents; (b) continue to make

payroll and to pay its necessary suppliers, utilities, insurance premiums and service providers; (c) and pay its employees and professionals (with respect to the latter, subject to approval by this Court of appropriate fee applications).

23. Allowing the Debtor to continue to use its cash collateral, and therefore, operate in the ordinary course until the Closing Date is in the best interest of the residents and will preserve the value of the estates for the benefit of creditors.

24. The Debtor proposes and believes that although the cash collateral may not be adequately replaced during the Use Period, the Lenders will be in a better position by allowing this use than they would be if there was an immediate cessation of the business. Pursuant to the terms of the proposed adequate protection contained herein and in the attached proposed order, the Senior Lender has consented to use of cash collateral.

### III. Proposed Adequate Protection

25. Pursuant to sections 361 and 363(e), and notwithstanding section 552(a), of the Bankruptcy Code, the Debtor proposes to grant the Lenders replacement liens on all of the Debtor's after acquired cash collateral arising post-petition to the same extent and in the same priority as such liens existed prior to the Petition Date.[1]

26. The Debtor further requests that in the event the replacement liens are insufficient to adequately protect the Lenders, the Lenders are entitled to a post-petition administrative expense claims against the Debtor's estates. Pursuant to section 507(b) of the Bankruptcy Code, such claims have priority in payment over any other indebtedness and/or obligations now in existence or incurred hereafter by the Debtor and over all unpaid administrative claims, expenses, or changes

---

[1] Notably, because the Subordinated Lender's prepetition liens were fully subordinated and junior to the Senior Lender's liens on the same cash collateral, the Subordinated Lender's liens likely do not attach to any of the cash collateral.

11

against the Debtor's property arising in this chapter 11 case or any superseding chapter 7 case, including without limitation of a kind specified in or authorized pursuant to sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 546(c) or 726 of the Bankruptcy Code, with the exception of claims granted superpriority under the DIP Credit Agreement and section 364(c), and the Carve-Out Expenses (defined below).

27. The Debtor also proposes to provide the Lenders with weekly financial reporting, comparing the revenues and expenses projected in the Budget to actual results, along with other financial reporting requested by the Lenders.  The Debtor will provide copies of the reporting to the United States Trustee and, if appointed, to any official committee of unsecured creditors.

28. Additionally, as to the Senior Lender, the Debtor proposes to provide additional protections that are justified by the Senior Lender's pre-petition and post-petition support of that has enabled the Debtor to protect the health and safety of their elderly residents, pay salary and benefits to employees, remain current on payments to vendors, and facilitate a going concern sale to maximize value for the estates.  Specifically, between August 2016 and the petition date, the Senior Lender loaned the Debtor approximately $450,000 to fund operational shortfalls.  Post-petition, the Senior Lender has agreed to advance up to $500,000 of additional financing to pursuant to the DIP Credit Agreement pending before this Court, again to fund shortfalls that cannot be paid using cash generated by the Debtor's business operations.  Finally, the Senior Lender has agreed to fund "stay bonuses" for certain key employees of the Debtor at the discretion of the CRO to facilitate an orderly transition of the Debtor's assets to a purchaser of substantially all of the Debtor's assets on or before June 15, 2017.  In recognition of this support, the Debtor has agreed to the following additional protections for the Senior Lender in the final order granting this Motion: (1) an acknowledgement of the validity, perfection, and priority of the Senior

Lender's pre-petition liens and the amount of the indebtedness owed to the Senior Lender; (2) waiver of the estates' right to seek to surcharge the Senior Lender's collateral pursuant to Bankruptcy Code section 506(c), beyond the amounts described in the Budget; and (3) a general release of any claims or causes of action that the Debtor may have against the Senior Lender. Under the circumstances of these cases, the Debtor submits that this additional protection is warranted without an extended investigation period for parties in interest.

**IV.     Carve Out**

29.     Under this Motion, the Lenders' liens and security interests shall be subject only to a carve-out for the following administrative expenses up to the amounts identified in the Budget through the date of an Event of Default (collectively, the "Carve Out Expenses"):

    a.     Statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6);

    b.     Fees payable to the Clerk of this Court; and

    c.     The unpaid and outstanding reasonable fees and expenses actually incurred and approved by order of the Court by attorneys, accountants, and other professionals retained by the Debtor and any statutory committee.

**V.     Compliance with LBR 4001-2**

29.     The provisions in this Motion require highlighting and justification pursuant to the LBR 4001-2(c) are set forth in detail in opening summary to this Motion and in paragraph 28 above.

30.     In accordance with the requirements of LBR 4001-2(b) relating to the interim use of cash collateral, the Debtor provides the following information:

a. The names and addresses of all creditors holding a secured interest in the cash collateral, and their attorneys if known:

Camden National Bank
c/o Jeremy Fischer
80 Marginal Way, Ste. 600
Portland, ME 04101-2480

New Hampshire Community Loan Fund
c/o Dan Luker
Preti Flaherty
PO Box 1318
Concord, NH 03302-1316

b. The efforts made to contact such secured creditors or their attorneys and any appointed committee or, if no committee has been appointed, the twenty (20) largest unsecured creditors with regard to the application to use cash collateral:

- The Debtor has had substantial contact with counsel for the Senior Lender prior to the filing of these chapter 11 cases and this Motion reflects an agreement between the Senior Lender and the Debtor. A copy of this Motion has been emailed to counsel for Camden National Bank.

- No committee has yet been appointed in this case.

- A copy of this Motion has been emailed (to the extent possible) and transmitted via facsimile on this date to each of the Debtors' combined twenty (20) largest creditors, together with any applicable government agencies, all as more fully described in the Omnibus Certificate of Service for First Day Motions, filed herewith.

c. The nature of the emergency requiring immediate relief:

- Without access to cash collateral, the Debtor will be unable to pay its payroll, utilities and suppliers, insurance premiums, and other ordinary and necessary operating expenses pending a final hearing. This could cause the Debtor to have to abruptly cease operations because without these critical supplies and services the Debtor would not be able to maintain a safe and beneficial living situation for it residents. Allowing the Debtor to continue to operate in the ordinary course until the Closing Date is best for the residents and will preserve the value of the estates for the benefit of creditors.

d. The total dollar amount of cash collateral use requested to be authorized:

- In accordance with the Budget, the sum of $1,059,523.53 in cash collateral will be used during the Use Period.

  e. A description of the adequate protection which will be provided to the Lenders is set forth above.

31. Attached as **Exhibit B** is the CRO's affidavit in support of this Motion, required by LBR 4001-2(b).

### V. Waiver of Memorandum of Law

32. Based upon the legal authority cited herein and the lack of any novel issues of law, the Debtor respectfully requests that the requirement of LBR 7102(3) be waived.

WHEREFORE, the Debtor respectfully requests that the Court enter an order, substantially in the proposed interim order filed herewith, granting the Debtor the relief requested in this Motion.

Respectfully submitted,

**SANCTUARY CARE, LLC**, and
**SANCTUARY AT RYE OPERATIONS, LLC**,

By Their Attorney,

Dated:  April 26, 2017            /s/ Peter N. Tamposi
                                  Peter N. Tamposi, BNH 04931

                                  Tamposi Law Group
                                  159 Main Street
                                  Nashua, New Hampshire 03060
                                  (Tel) (603) 204-5513
                                  (Fax) (603) 204-5515
                                  Email: peter@thetamposilawgroup.com