UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| In re: | CHAPTER 11 |
| Sanctuary Care, LLC, and<br>Sanctuary at Rye Operations, LLC, | Case Number 17-10591<br>Case Number 17-10590<br>Joint Administration Motion<br>Pending |
| Debtors | |

**MOTION FOR AN INTERIM ORDER AND SCHEDULING A HEARING FOR THE ISSUANCE OF A FINAL ORDER: (A) AUTHORIZING DEBTOR TO OBTAIN POST-PETITION FINANCING; AND (B) GRANTING TO CAMDEN NATIONAL BANK POST-PETITION SUPER-PRIORITY ADMINISTRATIVE EXPENSE STATUS**

The debtors-in-possession in the above jointly administered cases, Sanctuary Care, LLC ("SC") and Sanctuary at Rye Operations, LLC ("SRO," and together with SC the "Debtor" or the "Borrower") respectfully move (the "Motion") this Court to enter an interim (the "Interim Order") and final order (the "Final Order" and together with the Interim Order, the "DIP Orders") approving certain post-petition borrowing (the "Loan") between Camden National Bank (the "Lender") and the Borrower, upon the terms set forth in the DIP Credit Agreement attached hereto as **Exhibit A** (the "Credit Agreement"), pursuant to sections 105, 364, 503(b), and 507 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 4001, 9013, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

In support of this Motion, the Debtor states as follows:

**I.     Introduction with Summary of Loan Terms Pursuant to Bankruptcy Rule 4001(c)(1)(B).**

1. By this Motion, the Debtor seeks authority to obtain financing from the Lender on what it deems to be the advantageous terms set forth in the Credit Agreement which are summarized below:

a. Funding shall take place in multiple advancements in increments as necessitated by the Debtor's operating Shortfalls. The total maximum amount of the Loan shall be **$500,000**. [Credit Agreement § 2].

b. The interest rate is fixed at 5.00% per annum on any amounts advanced under the Loan. The default rate shall be 15.00% per annum. [Credit Agreement §§ 2.2.1 and 2.9].

c. The Loan proceeds shall be used to fund Shortfalls in accordance with the Approved Budget and the Financing Orders (all as defined in the Credit Agreement). The Loan proceeds may not be used for any other purpose without the written consent of the Lender, which may be withheld in its sole discretion. [Credit Agreement, § 2.7].

d. No payments shall be due from the Borrowers on account of the Loan until the Maturity Date, at which time the entire outstanding principal balance thereof, together with all accrued but unpaid interest thereon and any other charges, fees and other amounts payable in connection with the Loan is due in full. [Credit Agreement § 2.3 and Definitions].

e. The Maturity Date is the earlier of the following: June 15, 2017 (unless extended pursuant to that certain Asset Purchase Agreement (the "APA") by and among the Debtors, as seller, and NBR Acquisition Rye, LLC ("NBR"), as purchaser and Section 2.10 of the Credit Agreement), (b) the date of closing of the sale contemplated in

the APA, or (c) the occurrence of any Event of Default, unless timely cured pursuant to the Credit Agreement. [Credit Agreement, Definitions].

    f.    Every amount due under the Loan shall constitute an administrative claim in the Debtor's bankruptcy with priority over any and all administrative expenses and other claims pursuant to Bankruptcy Code section 364(c)(1) and the Financing Orders. [Credit Agreement § 2.8(a)].

    g.    Upon the occurrence of the Maturity Date, the Lender shall be entitled to immediate payment of such Obligations without further application to or order of this Court. [Credit Agreement § 2.3].

    h.    The Maturity Date shall be extended thirty (30) days if the purchaser (either NBR or the successful bidder) elects to exercise its option to extend the date of the closing of the sale pursuant to section 5.2 of the APA, and if: (a) the representations and warranties set forth in the Credit Agreement continue to be true and correct in all material respects, with the same effect as though made on and of such date, except to the extent such representations and warranties expressly relate to an earlier date; and (b) no Event of Default occurred under the Credit Agreement nor under any Loan Document, nor does any condition exist which, with the passage of time or the giving of notice (or both), will ripen into an Event of Default. [Credit Agreement §§ 2.10 and 6.1].

    i.    Closing of the Loan is contingent on certain conditions being satisfied, including, but not limited to: (i) the Borrowers shall have executed and delivered the Loan Documents attached as Exhibit B to the Credit Agreement; (ii) this Court shall have issued the Interim Order and/or the Final Order, together defined and referred to in the Credit Agreement as the Financing Orders and they shall not have been stayed or

appealed; (iii) Borrowers shall have delivered to Lender the Initial Approved Budget as required by Section 3.1(b) of the Credit Agreement; (iv) the Borrowers shall have sought an expedited hearing on "first day" motions relating to use of cash collateral, bidding procedures, and approval of the sale contemplated by and consistent with the requirements of the APA; (v) for each advancement under the Loan, Borrowers shall have first delivered to Lender a Loan Request in accordance with Section 2.1.3 of the Credit Agreement; (vi) the representations and warranties set forth in the Credit Agreement, including Section 4, and the Loan Documents shall continue to be true and correct in all material respects with the same effect as though made on and of such date, except to the extent such representations and warranties expressly relate to an earlier date; (vii) no Event of Default shall exist under the Credit Agreement or that, with the passage of time or the giving of notice (or both), will ripen into an Event of Default; and (viii) all other Conditions Precedent enumerated in Section 3 of the Credit Agreement shall have been and continue to be met.

j. The terms of the Loan do not contain any of the provisions listed in Bankruptcy Rule 4001(c)(1)(B)(ii), (iii), (iv), (v), (vi), (vii), (ix), (x), or (xi). As noted above, the Loan does involve granting the Lender priority under Bankruptcy Code section 364(c)(1) (*see* Bankruptcy Rule 4001(c)(1)(B)(i) and Credit Agreement § 2.8(a)), and a release of all claims against the Lender (see Bankruptcy Rule 4001(c)(1)(B)(viii) and Credit Agreement § 7.1)).

2. After a diligent search and exploration of alternatives, the Debtor is unable to obtain unsecured financing on terms as favorable as those offered by the Bank without granting

super-priority administrative expense status to the Lender. Accordingly, the Debtor submits that the requirements of section 364(c), to the extent applicable, have been met.

## II. Jurisdiction, Venue and Statutory Basis for Relief

3. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(D).

4. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

5. The statutory bases for the relief requested herein are sections 105, 364, 503(b), and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001(c), 9013, and 9014.

## III. Background

### A. General Background

6. SC was created in 2007 for the purpose of developing a memory care assisted living facility. SC owns the land and buildings at 295 Lafayette Road in Rye, New Hampshire (the "Rye Property"). SRO is an operating company that was created in 2010. It is wholly owned by SC. As indicated in its LLC operating agreement, the purpose of SRO is to operate a memory care assisted living facility at the Rye Property.

7. Pursuant to an agreement dated June 29, 2012, SC leased the Rye Property to SRO for a term of fifty (50) years. SRO operates the memory care assisted living facility known as Sanctuary Care at Rye.

8. On April 25, 2017 (the "Petition Date"), the Debtors filed their Voluntary Petitions under chapter 11 of the Bankruptcy Code  The United States Trustee has yet to hold the Initial Debtor Interview or the First Meeting of Creditors, and no Official Committee of Unsecured Creditors has been appointed.

9. At this time, SRO continues to manage and operate its memory care residence through its employees as a debtor-in-possession.

10. On December 11, 2014, the Debtor executed and delivered to the Lender a commercial promissory note in the original principal amount of $12,000,000 secured by first priority liens on all of the Debtor's real and personal property assets. On the same date, the Debtor executed and delivered to the New Hampshire Community Loan Fund (the "Subordinate Lender") a commercial promissory note in the original principal amount of $3,850,000 secured by second priority liens on all of the Debtor's real and personal property assets. The Lender and the Subordinate Lender are parties to an intercreditor agreement memorializing their respective rights and obligations.

11. In early 2016, the Debtor defaulted on its obligations to both the Lender and the Subordinate Lender by, among other things, failing to make required principal and interest payments. Since that time, the Debtor has not made any regular payments to the Lender or the Subordinate Lender.

12. The Debtor and the Lender entered into a forbearance arrangement beginning on May 27, 2016, which was subsequently amended. Among other things, pursuant to the forbearance arrangement, Debtor retained The Vinca Group, LLC as its chief restructuring officer (the "CRO") and the Lender extended additional advances to protect patient safety and provide the Debtor with sufficient liquidity to ensure the payment of critical operational expenses to employees and vendors. Without continuing pre-petition assistance from the Lender, the Debtor would have been forced to immediately cease operations, causing interruption in the valuable and critical care to their elderly residents and causing employees to go unpaid. Because the Debtor's cash flow from operations is insufficient to meet its operating expenses, let alone

debt service to the Lender and the Subordinate Lender, the Debtor has determined that a prompt sale of its assets as a going concern is the best means to maximize its value and assure continuity of care for its patients. It is for these critical reasons that the Debtor filed for chapter 11 relief and has proposed an expedited sale of all of its Assets to a buyer that is qualified to operate the facility.

13. It is equally critical that the post-petition financing be approved so that the Debtor can continue to operate until the Closing Date, at which time NBR or the successful bidder will take over responsibility for the monthly operating costs and will continue to operate the business for the benefit of the Debtor's elderly residents and employees. As noted, the Debtor's cash flow from operations is insufficient to meet its operating expenses. The Loan is needed to meet the cash Shortfalls identified in the Approved Budget, a copy of which is attached hereto as **Exhibit B**.

**IV. Relief Requested**

15. By this Motion, the Debtor requests entry of an Interim Order and then a Final Order, substantially in the forms filed hereto as proposed orders: (a) authorizing the Debtor to (i) obtain post-petition financing pursuant to the advantageous terms and conditions of the Credit Agreement and (ii) incur the Obligations enumerated in the Credit Agreement; (b) authorizing the Debtor to execute and enter into the Credit Agreement and the related Loan Documents and to perform the Debtor's Obligations thereunder and such other and further acts as may be required in connection with the Loan Documents, including, without limitation, the payment of all principal, interest, fees, expenses and other amounts payable under the Loan Documents as such amounts become due and payable; (c) approving the Debtor's request to grant the Lender's claims under the Credit Agreement super-priority administrative claim status pursuant to

7

Bankruptcy Code section 364(c)(1); (d) authorizing the Debtor to borrow under the Credit Agreement up to an aggregate principal or face amount of $500,000, to be used in accordance with the terms of the Credit Agreement and the Approved Budget; (e) granting the Lender the protections of a good faith lender under Bankruptcy Code section 364(e); and (f) authorizing the Debtor to access certain amounts under the Loan to avoid immediate and irreparable harm under Bankruptcy Rule 4001(c)(2).

**V.    Basis for Relief**

16.    Courts generally defer to a debtor's business judgment in granting post-petition financing under section 364.  *See In re DB Capital Holdings, LLC*, 454 B.R. 804, 822 (Bankr. D. Colo. 2011) (citing cases).  It is in the Debtor's sound business judgment that the Loan is necessary in order to continue operations until the asset sale which is critical to preserve the value of the estate and safeguard the safety and well-being of the Debtor's elderly residents and valued employees.

**A.    The DIP Loan Is Necessary to Preserve Estate Assets and Is an Exercise of the Debtor's Sound Business Judgment**

17.    A debtor's decision to enter into a post-petition loan under Bankruptcy Code Section 364 is governed by the business judgment standard.  *See, e.g., TWA v. Travellers Int'l AG (In re TWA)*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving post-petition loan because it "reflect[ed] sound and prudent business judgment"); *see also U.S. Bank Trust Nat'l Ass'n v. Am. Airlines, Inc. (In re AMR Corp.)*, 485 B.R. 279, 288 (Bankr. S.D.N.Y. 2013) ("In determining whether to approve a debtor's request under Section 364, a Court must examine whether the relief requested is an appropriate exercise of the debtor's business judgment."); *A&K Endowment, Inc. v. Gen. Growth Props., Inc. (In re Gen. Growth Props., Inc.)*, 423 B.R. 716, 725 (S.D.N.Y. 2010) (finding that DIP financing benefitted estate and reflected an exercise of the

debtor's prudent business judgment); *Ames Dep't Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (noting that other decisions under section 364 find that financing reflects a debtor's business judgment).

18. Generally, the business judgment standard requires that, absent evidence to the contrary, a debtor-in-possession is afforded discretion to act with regard to business decision-making. *See In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985) ("[D]iscretion to act with regard to business planning activities is at the heart of the debtor's power.") (citations omitted). A court should "examine whether a reasonable business person would make a similar decision under similar circumstances" to determine whether the business judgment standard has been met. *In re Dura Auto. Sys., Inc.*, No. 06-11202 (KJC), 2007 WL 7728109, at *97 (Bankr. D. Del. Aug. 15, 2007)(quoting *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006)). "More exacting scrutiny [of the debtor's business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985). The Debtor's decision to enter into the Loan on the favorable terms set forth in the Loan Documents satisfies this standard.

19. Consistent with this authority, the Debtor's decision to enter into the Loan is the culmination of the Debtor's good faith efforts to procure the best available financing under the circumstances. Ultimately, the Debtor determined that entry into the Loan is the best option available and entry of the Final Order is in the best interests of the Debtor, the estates, the Debtor's elderly residents and valued employees. As discussed above, the Loan is necessary to prevent immediate cessation of the Debtor's business which would leave residents without

proper care. The Debtor needs to access the Loan to, among other things, continue the operation of the business in an orderly manner, maintain business relationships with vendors and suppliers, pay the employees, and satisfy other working capital, operational, and administrative needs—each of which is vital to preserving and maintaining the Debtors' going concern value until the sale. The inability to meet payments to vendors and pay employees would impair, if not destroy, the Debtor's prospects for any effective sale and would jeopardize the safety and well-being of the Debtor's residents.

20. The Debtor respectfully submits that the decision to enter into the Loan and the Loan Documents is an exercise of sound business judgment that the Court should approve. The Debtor's took the steps they deemed necessary and exercised their sound business judgment in negotiating the favorable terms of the Loan.

### B. The Loan Terms Are Fair, Within the Range of Reasonableness, and Appropriate Under the Circumstances

21. In determining whether the terms of a debtor's proposed post-petition financing arrangement are fair and reasonable, courts consider the relative circumstances of both the debtor and the potential lender. *See In re Farmland Indus., Inc.*, 294 B.R. 855, 885-89 (Bankr. W.D. Mo. 2003) (finding that terms of post-petition financing were reasonable when taken in context and relative circumstances of the parties were considered); *see also In re Ellingsen MacLean Oil Co.*, 65 B.R. 358, 364-65 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard" bargains to acquire funds for its reorganization*).*

22. When judged from the foregoing perspective, the terms of the Loan are fair within the range of reasonableness, and appropriate under the circumstances. The Loan provides the Debtor with the liquidity it needs to facilitate an orderly sale process and to obtain the highest and best price for their assets as a going concern. As noted above, the Debtor made concerted,

good faith efforts to obtain credit on the most favorable terms available. Against this backdrop, the Debtor and its advisors carefully evaluated the proposed financing offered by the Loan and engaged in good faith, arm's-length negotiations with the Lender. The Debtor, exercising its sound business judgment, agreed to the Loan as the proposal best suited to the Debtor's needs. The Debtor submits that the terms of the Loan are quite favorable to the Debtor and its estate, including, among other things, (a) obtaining credit on an unsecured basis, (b) having no payment obligations to the Lender until the Maturity Date, and (c) obtaining a below market interest rate of only five percent (5%) for a loan involving the types of risks involved in this case.

23. Moreover, the Loan involves no fees or charges payable to the Lender, other than reimbursing the Lender for its Loan-related costs on the Maturity Date. The absence of Loan-related fees and charges is unusually favorable to the Debtor, and thus they are within the range of reasonableness.

24. Accordingly, the Debtor respectfully submits that the terms of the Loan are fair, within the range of reasonableness, and appropriate under the circumstances.

**C.    The Loan Was Negotiated in Good Faith and Should Be Afforded the Protection of Bankruptcy Code Section 364(e)**

25. Bankruptcy Code section 364(e) protects a good faith lender's right to collect on loans extended to a debtor and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal. Bankruptcy Code section 364(e) provides that any reversal or modification on appeal of an authorization to obtain credit or incur debt or a grant of priority or a lien under Bankruptcy Code section 364(e) shall not affect the validity of that debt incurred or priority or lien granted as long as the entity that extended credit "extended such credit in good faith." 11 U.S.C. § 364(e).

26. Courts generally hold that "good faith" in the context of post-petition financing means, consistent with the Uniform Commercial Code, honesty in fact in the conduct or transaction concerned. *See Unsecured Creditors' Comm. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 834 F.2d 599, 605 (6th Cir. 1987) (citing U.C.C. § 1-201(19)). Additionally, "[g]ood faith is measured with respect to the good faith of the lender as contrasted to that of the borrower." Hr'g Tr. 736:24-25, *In re Lyondell Chem. Co.*, No. 09-10023 (Bankr. S.D.N.Y. Feb. 27, 2009).

27. As explained in detail herein, the terms of the Loan were negotiated in good faith and at arm's-length between the Debtor and the Lender, and all of the Loan obligations will be extended by the Lender under the Loan in good faith (as such term is used in Bankruptcy Code section 364(e)). No consideration is being provided to any party to, or guarantor of, obligations arising under the Loan, other than as set forth in the Credit Agreement.

**D. Interim Advances Are Necessary Pending the Final Hearing to Avoid Immediate and Irreparable Harm.**

28. Bankruptcy Rule 4001(c)(2) provides that a final hearing on a motion for authorization to incur post-petition loans may not be commenced until at least fourteen days after service of the motion. Upon request, however, this Court is empowered to conduct a preliminary hearing on the motion and to authorize interim loans to avoid immediate and irreparable harm to the Debtor's estates. Id.

29. As set forth above, without access to capital, the continued operation of the Debtor's business would be threatened and would likely result in harm to the Debtor, its estate, its valued employees, and its elderly residents. Accordingly, the Debtor submits that it has satisfied the requirements to support immediate authority to access the requested capital under the Loan on an interim basis to avoid immediate and irreparable harm pending a final hearing, as

required by Bankruptcy Rule 4001(c)(2). The necessary amounts are set forth in the Approved Budget.

**E.     Notice**

30.     As indicated on the Omnibus Certificate of Service for the First Day Motions, this Motion was served on the: (1) the United States Trustee; (2) the Debtor's secured creditors, or, if applicable, the lawyers representing such creditors; and (3) the non-insider holders of the twenty largest unsecured claims against each Debtor or, if applicable, the lawyers representing such holders; and (4) applicable federal and state authorities.

WHEREFORE, the Debtor requests that the Court enter an Order substantially in the form of the attached Interim Order and Final Order:

(i)     granting this Motion and approving the Loan upon the terms set forth herein and in the Credit Agreement;

(ii)    granting the Lender a super-priority administrative expense status for the amounts advanced post-petition under the Credit Agreement;

(iii)   determining that, to the extent applicable, the requirements of section 364(c) have been satisfied;

(iv)    finding that the Lender acted in good faith in relation to the Loan under section 364(e) of the Bankruptcy Code;

(v)     authorizing the Debtor to access certain amounts under the Loan (as set forth in the Approved Budget) on an interim basis to avoid immediate and irreparable harm pursuant to Bankruptcy Rule 4001(c)(2);

(vi)    scheduling a final hearing on the Motion; and

(vii)   granting such other and further relief as is just and appropriate.

Respectfully submitted,

**Sanctuary Care, LLC and
Sanctuary at Rye Operations, LLC,**

Dated: April 26, 2017					By:*/s/ Peter N. Tamposi*
							Peter N. Tamposi (BNH #04931)
							The Tamposi Law Group, P.C.
							159 Main Street
							Nashua, NH 03060
							603-204-5513
							peter@thetamposilawgroup.com