## Exhibit A

## DIP CREDIT AGREEMENT

THIS DIP CREDIT AGREEMENT (the "Agreement") is effective as of April __, 2017, by and between SANCTUARY CARE LLC, a New Hampshire limited liability company ("SC"), and SANCTUARY AT RYE OPERATIONS LLC, a New Hampshire limited liability company ("SRO," and together with SC, the "Borrowers"), and CAMDEN NATIONAL BANK, a federally chartered savings bank headquartered in Maine (the "Lender," and together with the Borrowers, the "Parties").

## RECITALS

WHEREAS, the Borrowers intend to file voluntary petitions for relief pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in order to facilitate an expedited sale of substantially all of their assets under section 363 of the Bankruptcy Code;

WHEREAS, the Borrowers have requested that the Lender provide a line of credit to fund their operational shortfalls pending a sale closing; and

WHEREAS, the Lender is willing to provide the Borrowers with a line of credit on the terms and conditions set forth in this Agreement.

## AGREEMENT

NOW, THEREFORE, Parties agree as follows:

SECTION 1. DEFINITIONS.

1.1     Unless otherwise defined herein, the following capitalized terms have the following meanings:

"Affiliates" mean any parent corporation or subsidiary of Borrowers, or any subsidiary of any of the foregoing, or any other entity in control of, controlled by, or in common control with Borrowers.

"Approved Budget" means the Initial Approved Budget and, upon approval of the Lender and the Bankruptcy Court, any updated 13-week cash flow budget delivered pursuant to Section 5.1.1(a)(ii).

"APA" means that certain Asset Purchase Agreement by and among the Borrowers, as Sellers, and NBR Acquisition Rye, LLC, as Purchaser, dated March 8, 2017.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of New Hampshire.

"Bankruptcy Rules" mean the Federal Rules of Bankruptcy Procedure.

"Budget Period" means the period beginning on the Effective Date and ending on the Maturity Date.

"Business Day" means any date of the year, other than any Saturday, Sunday or any day on which banks located in Maine generally are closed for business.

"Chapter 11 Cases" means the chapter 11 cases commenced by the Borrowers in the Bankruptcy Court.

"CRO" shall means the Chief Restructuring Officer authorized and retained by the Borrowers pursuant to that certain CRO Agreement effective as of September 3, 2016, as amended.

"Effective Date" means the date upon which the Bankruptcy Court enters the Interim Order approving the Loans on the terms set forth herein.

"Event of Default" has the meaning assigned to such term in Section 6.1.

"Final Order" means, the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court which order shall be satisfactory in form and substance to Lender, together with all extensions, modifications and amendments thereto, which, among other matters but not by way of limitation, authorizes Borrowers to incur Loans in an aggregate principal amount not to exceed the Maximum Amount.

"Financing Order" means, the Interim Order or the Final Order, whichever is in effect at the time of any determination made hereunder, and "Financing Orders" means the Interim Order and the Final Order, collectively.

"Indebtedness" of any person means, without duplication, (a) all obligations of such person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such person evidenced by bonds, debentures, notes or similar instruments, (c) all obligations of such person upon which interest charges are customarily paid, (d) all obligations of such person under conditional sale or other title retention agreements relating to property acquired by such person, (e) all obligations of such person in respect of the deferred purchase price of property or services (excluding current accounts payable incurred in the ordinary course of business), (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any lien on property owned or acquired by such person, whether or not the Indebtedness secured thereby has been assumed, (g) all guarantees by such person of Indebtedness of others, (h) all capital lease obligations of such person, (i) all obligations, contingent or otherwise, of such person as an account party in respect of letters of credit and letters of guaranty, (j) all obligations, contingent or otherwise, of such person in respect of bankers' acceptances and (k) all obligations of such person under sale and leaseback transactions.

"Initial Approved Budget" has the meaning assigned to such term in Section 3.1(b).

"Interim Order" means the order of the Bankruptcy Court entered in the Chapter 11 Cases after an interim hearing (assuming satisfaction of the standards prescribed in section 364 of the

Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), in form and substance satisfactory to Lender, together with all extensions, modifications and amendments thereto, which, among other matters but not by way of limitation, authorizes, on an interim basis, Borrowers to execute and perform under the terms of this Agreement and incur Loans in an aggregate principal amount not to exceed the interim amount approved by the Bankruptcy Court   prior to the date of entry of the Final Order.

"Loans" mean, collectively, all extensions of credit made by Lender to Borrowers pursuant to this Agreement.

"Loan Documents" means this Agreement, the Financing Orders and any other documents executed in connection with the Obligations or the transactions contemplated hereby, as the same may from time to time be amended, modified, supplemented or restated.

"Loan Request" means each request for a Loan submitted by Borrowers to Lender in substantially the form of **Exhibit A**, a copy of which the Borrowers shall provide to the parties listed on **Exhibit C**.

"Losses" has the meaning assigned to such term in Section 5.1.4.

"Maturity Date" means the earliest of (a) June 15, 2017 (unless extended pursuant to the APA and Section 2.10 of this Agreement), (b) the date of closing of the sale contemplated in the APA, (c) the occurrence of any Event of Default, unless timely cured pursuant to this Agreement.

"Maximum Amount" means the aggregate principal amount of the Loans made by Lender to Borrowers pursuant to this Agreement, not to exceed $500,000.

"Obligations" means all principal, interest, fees, expenses and other amounts owing by Borrowers to Lender pursuant to this Agreement.

"Permitted Indebtedness" means (i) the Obligations and (ii) Indebtedness existing on the date hereof and set forth in **Exhibit D**.

"Petition Date" means the date on which the Borrowers file voluntary petitions for relief in the Bankruptcy Court commencing the Chapter 11 Cases.

"Pre-Petition Debt" means Indebtedness incurred prior to the Petition Date.

"Purchaser" means NBR Acquisition Rye, LLC or the successful bidder approved by the Bankruptcy Court following the auction of substantially all of the Borrowers' assets under Bankruptcy Code section 363.

"Shortfalls" mean the difference between the Borrowers' weekly operational revenues and expenses, as set forth in the Approved Budget.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any governmental authority, including any interest, additions to tax or penalties applicable thereto.

SECTION 2. GENERAL TERMS AND CREDIT ARRANGEMENTS.

2.1     Line of Credit.

2.1.1   Loans.  Subject to the terms and conditions of this Agreement, Lender agrees to make the Loans to the Borrowers to fund Shortfalls, during the Budget Period and pursuant to the Approved Budget, not to exceed the Maximum Amount.

2.1.2   Loan Amounts.  On the Effective Date, and no more frequently than once during each week thereafter (or with such greater frequency as Lender may agree), Borrowers may request Loans to fund Shortfalls identified in the Approved Budget; provided, however, that the expenditures in each expense category may not exceed 110 percent (110%) of the amounts set forth in the Approved Budget; and provided, further, that the aggregate principal amount of Loans requested shall not exceed the Maximum Amount.

2.1.3   Loan Requests.  To obtain a Loan, the CRO, on behalf of the Borrowers, shall complete, sign and deliver a Loan Request to Lender at least one (1) Business Day before the applicable borrowing date, other than the Effective Date.  A copy of each Loan Request must be transmitted to the parties identified on **Exhibit C**.

2.1.4   Funding.  Upon the terms and subject to the conditions set forth herein, Lender shall make available to Borrowers an amount equal to each requested Loan in immediately available funds on the applicable borrowing date.  Such Loans shall be deposited into the Borrowers' deposit account as follows:

> Bank Name: [_____]
> ABA: [_____]
> Account Name: [_____]
> Account #: [_____]
> Ref: [_____]

2.2     Interest; Expenses.

2.2.1   Interest Rate.  Interest on the outstanding loan balance shall be five (5%) percent per annum. Interest shall be computed on the maximum outstanding principal balance on this Agreement on each day, and shall accrue for each and every day on which any indebtedness remains outstanding hereunder, including the day on which funds are initially advanced regardless of the time of day such advance is made.

2.2.2   Expenses.  The Borrowers shall be liable to the Lender for all actual expenses incurred by the Lender related to this Agreement, including the Lender's reasonable attorneys' fees for negotiating and documenting this Agreement, as well as collection costs following any Event of Default.

2.3     Payments.  No payments shall by due from the Borrowers on account of the Loan until the Maturity Date, at which time the entire outstanding principal balance hereof, together with all accrued but unpaid interest thereon and any other charges, fees and other amounts payable in connection herewith the Loan.

2.4   <u>Application of Payments</u>.  All payments shall be applied to the Obligations as Lender determines in its sole discretion.

2.5   <u>Taxes; Increased Costs</u>.

2.5.1   <u>Taxes</u>.

(a) All payments by Borrowers under this Agreement or any other Loan Document shall be made free and clear of all Taxes, except as required by applicable law.  If any applicable law requires the deduction or withholding of any Tax from any such payment from or in respect of any sum payable under any Loan Document by Borrowers, then Borrowers is responsible for timely payment of the full amount due to the relevant governmental authority in accordance with applicable law.

(b)   Borrowers shall indemnify Lender, within 10 days after demand therefor, for the full amount of any Taxes payable or paid by Lender and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant governmental authority.  A certificate as to the amount of such payment or liability delivered to Borrowers by Lender shall be conclusive absent manifest error.

2.5.2   <u>Change in Law</u>.  If the introduction of or any change in, after this agreement is executed by Lender, any applicable law increases Lender's costs or reduces its income for advances under this Agreement, then Borrowers shall upon demand by Lender promptly pay to Lender the increase in cost or reduction in income or additional expense; <u>provided</u>, <u>however</u>, that all requests, rules, guidelines or directives issued or promulgated under, in connection with or pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act or Basel III shall be deemed to be a change in applicable law, regardless of the date enacted, adopted or issued.

2.6   <u>Limit on Credit Extension</u>. Except as expressly stated in this Agreement, Lender does not directly or indirectly have any obligation or duty of any kind whatsoever to renew or extend any indebtedness of Borrowers to Lender, to grant or extend any further loans or credit to Borrowers, to amend, modify or supplement this Agreement, or to otherwise alter its present rights, powers or remedies or the present rights, powers or remedies of Borrowers.

2.7   <u>Use of Loan Proceeds</u>. The Loan proceeds shall be used to fund Shortfalls in accordance with the Approved Budget and the Financing Orders. The Loan proceeds may not be used for any other purpose without written consent of Lender, which may be withheld in its sole discretion.

2.8   <u>First Priority Nature of Obligations</u>.

(a)   All Obligations shall constitute an administrative claim with priority over any and all administrative expenses and other claims pursuant to Bankruptcy Code section 364(c)(1) and the Financing Orders.

(b)   Upon the maturity (whether by acceleration or otherwise) of any of the Obligations, Lender shall be entitled to immediate payment of such Obligations without further application to or order of the Bankruptcy Court.

2.9     Default Rate.  Upon any Event of Default (whether or not Lender has accelerated payment of this Agreement) or after maturity, the unpaid principal balance of this Agreement shall, at the option of Lender, bear interest at the rate of fifteen (15%) percent per annum.

2.10    Extension of Maturity Date.  The Maturity Date shall be extended thirty (30) days if the Purchaser elects to exercise its option to extend the date of the closing date of the sale pursuant to section 5.2 of the APA, if (a) the representations and warranties set forth in this Agreement, including Section 4 shall be true and correct in all material respects, with the same effect as though made on and of such date, except to the extent such representations and warranties expressly relate to an earlier date; and  (b) no Event of Default exists under this Agreement nor under any Loan Document, nor does any condition exist which, with the passage of time or the giving of notice (or both), will ripen into an Event of Default.

SECTION 3. CONDITIONS PRECEDENT.

The obligations of Lender to make the Loans hereunder are subject to the satisfaction by Borrowers of each of the following conditions:

3.1     Initial Loan.  On or prior to Effective Date:

(a)     Borrowers shall have delivered to Lender each document, certificate and instrument set forth on Exhibit B hereto and such other documents as Lender may reasonably request;

(b)     Borrowers shall have delivered to Lender an Approved Budget setting forth the Borrowers' 13-week cash flow prepared by the CRO, including all projected revenues, expenses, and Shortfalls on a weekly basis in form, scope and substance acceptable Lender (the "Initial Approved Budget");

(c)     The Interim Order, in form and substance satisfactory to Lender, shall have been entered by the Bankruptcy Court and shall be in full force and effect and shall not have been vacated, stayed, reversed, modified or amended without the consent of Lender; and

(d)     The Borrowers shall have filed and sought expedited hearing on "first day" motions relating to use of cash collateral, bidding procedures, and approval of the sale contemplated by the APA consistent with the requirements of the APA.

3.2     All Loans.  On the date of each Loan, including the Initial Loan:

(a)     Borrowers shall have delivered to Lender a Loan Request in accordance with Section 2.1.3 hereof;

(b)     The representations and warranties set forth in this Agreement, including Section 4, and the other Loan Documents shall be true and correct in all material respects on and as of such date, with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date;

6

(c)     No Event of Default exists under this Agreement, nor does any condition exist which, with the passage of time or the giving of notice (or both), will ripen into an Event of Default;

(d)     If (A) such Loan is to be made on or after the date twenty (20) days after the Effective Date or (B) the amount of such Loan, together with the outstanding principal amount of the Loans hereunder, shall exceed the interim amount approved by the Bankruptcy Court, then the Bankruptcy Court shall have entered the Final Order on or prior to such date;

(e)     The Interim Order or the Final Order, as the case may be, shall not have been vacated, stayed, reversed, modified or amended without the consent of Lender;

(f)     The Interim Order or the Final Order, as the case may be, shall not be subject to any motion for reconsideration or appeal.

Each Loan Request hereunder shall be deemed to constitute a representation and warranty by Borrowers on the date of such Loan as to the matters specified in this Section 3.2 and as to the matters set forth in such request.

## SECTION 4. REPRESENTATIONS AND WARRANTIES.

In order to induce Lender to enter into this Agreement and to make the Loans, the Borrowers, by signing below, makes each of the following representations and warranties to Lender as of the date hereof and as of the date of each Loan Request hereunder:

4.1     <u>Organization; Good Standing</u>. The Borrowers (a) are limited liability companies duly organized, validly existing and in good standing under the laws of the State of New Hampshire; and (b) have all requisite power to conduct its business as now conducted and as presently contemplated;.

4.2     <u>Authorization</u>. The execution, delivery, and performance of this Agreement and the transactions contemplated hereby and thereby: (a) are within the authority of the Borrowers; (b) have been duly authorized by all necessary action and proceedings; (c) do not conflict with or result in any breach or contravention of any provision of law, statute, rule or regulation to which the Borrowers are subject or any judgment, order, writ, injunction, license or permit applicable to the Borrowers; (d) do not violate or conflict with any provision of the Borrowers' organizational documents or other charter documents or operating agreements of, or any agreement or other instrument binding upon, the Borrowers; and (e) do not require the consent or approval of any other person with the sole exception of any consents or approvals that the Borrowers have already obtained and delivered to Lender and the authorization of the Bankruptcy Court pursuant to the Financing Orders.

4.3     <u>Enforceability; No Default</u>. The execution and delivery of this Agreement and the other Loan Documents will result in valid and legally binding obligations of the Borrowers, enforceable against the Borrowers in accordance with the respective terms and provisions thereof, except as such enforceability may be subject to limitations on the rights and remedies of creditors generally imposed under bankruptcy or insolvency law and that the availability of equitable relief

7

is sought to the discretion of the court from which such relief is sought.  No Event of Default exists under this Agreement nor under any Loan Document, nor does any condition exist which, with the passage of time or the giving of notice (or both), will ripen into an Event of Default.

4.4     Governmental Approvals.  The execution, delivery, and performance by the Borrowers of this Agreement and the other Loan Documents and the transactions contemplated hereby and thereby do not require the approval or consent of, or filing with, any governmental agency or authority other than those already obtained.

4.5     Litigation.  There are no actions, suits, proceedings or, to the best of Borrowers' knowledge, investigations of any kind pending or threatened against the Borrowers, either individually or collectively, before any court, tribunal or administrative agency or board that, if adversely determined, might, either in any case or in the aggregate, materially adversely affect the properties, assets, financial condition or business of the Borrowers or materially impair the right of the Borrowers to carry on business substantially as now conducted by it, or result in any substantial liability not adequately covered by insurance, or for which adequate reserves are not maintained on the balance sheet of the Borrowers, or which question the validity of this Agreement or any of the other Loan Documents, or any action taken or to be taken pursuant hereto or thereto.

4.6     No Materially Adverse Contracts, Etc.  Neither of the Borrowers, nor any of their Affiliates, is subject to any charter, corporate or other legal restriction, or any judgment, decree, order, rule or regulation that has or is expected in the future to have a materially adverse effect on the business, assets or financial condition of the Borrowers.  The Borrowers are not a party to any contract or agreement that has or is expected, in the judgment of the Borrowers' officers, to have any materially adverse effect on the business of the Borrowers.

4.7     Taxes.  The Borrowers have filed all federal, state and other tax returns required to be filed or has obtained appropriate extensions therefor, and all taxes, assessments and other governmental charges due from the Borrowers have been fully paid or are not yet required to be paid.

4.8     Laws.  Borrowers are not in violation of any applicable law, rule or regulation, or in default with respect to any judgment, writ, injunction or decree of any governmental authority.

4.9     Investment Company Act.  Neither Borrower is an "investment company" or a company "controlled" by an "investment company" within the meaning of the Investment Company Act of 1940.

4.10     Information.  No information (financial or otherwise), report, financial statement, exhibit or schedule furnished, by or on behalf of Borrowers to Lender in connection with any Loan Document or included therein or delivered pursuant thereto contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading at the time such statement was made or deemed made.

4.11     Approved Budget.  The Approved Budget prepared by the CRO reasonably presents, in all material respects, on a pro forma basis, the projected financial operations and disbursements of Borrowers for the period specified therein, and such projections in the view of

the CRO are reasonably achievable based upon reasonable assumptions and other information available as of the first day of such period.

4.12  Chapter 11 Matters.

(a)  Proper notice for the hearing(s) for the approval of the Financing Orders has or will be given.

(b)  After the entry of the Interim Order, and pursuant to and to the extent permitted in the Financing Orders, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Cases having superior priority to all other administrative expense claims.

(c)  The Interim Order (with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on or after entry of the Final Order), as the case may be, is in full force and effect has not been reversed, stayed, modified or amended without the prior written consent of Lender and is not subject to any motion for reconsideration or any appeal.

SECTION 5. COVENANTS.

5.1  Affirmative Covenants. In order to induce Lender to enter into this Agreement, the Borrowers, by signing below, individually make each of the following affirmative covenants with Lender:

5.1.1  Financial Information; Notices.

(a)  Deliveries. Borrowers shall furnish to Lender and all parties listed on **Exhibit C** each of the following:

(i)  Bankruptcy Matters.  Copies of all monthly operating reports, projections or other information respecting Borrowers' business or financial condition or prospects as well as all pleadings, motions, applications, and judicial information filed by or on behalf of Borrowers with the Bankruptcy Court or provided by or to the U.S. Trustee or any committee, at the time such document is filed with the Bankruptcy Court, or provided by or to the U.S. Trustee or any committee; and

(ii)  Variance Report.  On or before 1:00 PM (United States Eastern time) on each Tuesday the CRO shall prepare and provide the Lender with a weekly line-by-line budget variance report prepared, in form and scope reasonably acceptable to Lender, which report shall compare actual revenues, expenses, and Shortfalls with amounts provided for in the Approved Budget on a line-by-line basis for the prior week; and

(b)  Notices. Borrowers shall promptly (and in any event no later than two (2) Business Days after becoming aware thereof) notify Lender of the occurrence of any Event of Default or any event or circumstance that, with the giving of notice or lapse of time or both, may constitute an Event of Default (including, without limitation, any breach of any representation or covenant or any material adverse change) specifying, in each case, the nature and anticipated effect thereof and any action proposed to be taken in connection therewith.

9

5.1.2    Inspection by Lender. The Borrowers shall permit Lender or its designees, at any reasonable time and upon reasonable prior notice (or if an Event of Default shall have occurred and is continuing, at any time and without prior notice), to (i) visit and inspect the properties, books and records of the Borrowers (and the Borrowers shall make such properties, books and records available during any such inspection) and (ii) discuss the affairs, finances and accounts of the Borrowers with their appropriate officers, employees and accountants.

5.1.3    Maintenance of Books and Records. Borrowers shall maintain its books and records relating to its financial affairs at all times in accordance with, and all financial statements provided for herein shall be prepared in accordance with, generally accepted accounting principles.

5.1.4    Indemnity. Borrowers agree to indemnify Lender and its affiliates and its and their respective partners, members, managers, shareholders, directors, agents, officers and employees and each other person, if any, who controls or acts on behalf of Lender or any of the foregoing and to hold Lender and such other persons harmless from and against all losses, claims, damages, liabilities and expenses (including expenses of litigation or preparation therefor) ("Losses") which Lender or such other persons may incur or which may be asserted against Lender or such other persons in connection with or arising out of the matters referred to in this Agreement or any of the Loan Documents, including without limitation any Losses arising out of the exercise by the Lender of any discretionary rights it may have under this Agreement or any of the other Loan Documents.

5.1.5    Compliance With Laws. Borrowers shall acquire and maintain all licenses, permits or approvals necessary for the conduct of its business, including but not limited to environmental approvals. Borrowers shall maintain at all times compliance with all applicable federal, state and local laws, rules and regulations, including those relating to environmental, land use, fuel and chemicals. Borrowers shall promptly notify Lender of any change in the environmental status of any applicable property from that previously supplied to Lender, and of the commencement of any federal, state or local private environmental or land use investigation or enforcement proceeding or threat thereof.

5.1.6    Operation of Business.  Borrowers shall conduct its business in the ordinary course, as agreed to by Borrowers in Section 4.1(a) of the APA.

5.1.7    Exclusive Deposit Relationship.   The Borrowers have and shall maintain an exclusive deposit and banking relationship with the Lender until the Obligations are fully repaid to Lender.  The Lender shall have the right to setoff any accounts, deposits, balances, or other sums credited to Borrowers against the Obligations.

5.1.8    CRO.  The Borrowers have retained the CRO, whose retention shall continue through the Chapter 11 Cases unless replaced by a Lender-approved replacement.

5.2    Negative Covenants. In order to induce Lender to enter into this Agreement, the Borrowers, by signing below, makes each of the following negative covenants with Lender:

5.2.1    Indebtedness.  Borrowers shall not create, incur, assume, guarantee or be or remain liable with respect to any Indebtedness, other than Permitted Indebtedness and Indebtedness incurred and paid in the ordinary course of business pursuant to the Approved Budget.

Additionally, Borrowers shall not prepay any Indebtedness or take any actions which impose on Borrowers an obligation to prepay any Indebtedness.

5.2.2  <u>Transfers of Funds</u>. The Borrowers will not make any dividends or other distributions, other than salaries, commissions, bonuses and normal reimbursable expenses incurred in the ordinary course of its business, to Borrowers' managers, officers, directors, employees or equity holders.

5.2.3  <u>Merger; Consolidation; Sale or Lease of Assets; Amendment; Change of Business or Control</u>. Borrowers shall not without the prior written consent of Lender (a) merge or consolidate with or into any other entity; (b) issue or redeem any of its capital stock; (c) sell, lease or otherwise dispose of assets or properties except (i) as expressly permitted pursuant to the APA or (ii) with the consent of Lender; (d) liquidate, merge or consolidate into or with any other person or entity or otherwise fail to maintain its legal existence; (e) amend their Articles of Organization or Operating Agreement, or any other organizational document applicable to Borrowers; (f) sell, purchase, or otherwise dispose of any equity interest in Borrowers; or (g) alter the nature of business conducted by Borrowers.

5.2.4  <u>Transactions with Affiliates</u>.  Borrowers shall not directly or indirectly enter into or permit to exist any transaction with or for the benefit of any Affiliate of Borrowers, except for transactions in the ordinary course of business upon fair and reasonable terms that are no more favorable to such Affiliate than would be obtained in an arm's length transaction.

5.2.5  <u>Variance Covenant</u>.  Borrowers shall not permit the aggregate net cash flow (aggregate cash receipts minus aggregate cash disbursements) of Borrowers for any week during the Budget Period to negatively deviate more than ten percent (10%) from the projected net cash flow of Borrowers set forth in the Approved Budget for such week.

5.2.6  <u>Chapter 11 Claims</u>.  Borrowers shall not incur, create, assume, suffer to exist or permit any other administrative priority claim (including, without limitation, any administrative expenses of the kind specified in Bankruptcy Code sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b) or 726 which is *pari passu* with or senior to the claims of Lender against Borrowers or grant any lien on causes of action arising under chapter 5 of the Bankruptcy Code.

<u>SECTION 6. DEFAULTS; REMEDIES.</u>

6.1  <u>Default</u>. The following shall be events of default (each, an "<u>Event of Default</u>") under this Agreement, which shall not be curable unless a cure provision is set forth below or in any of the Loan Documents:

(a) any representation or warranty of the Borrowers made in any Loan Document shall prove to be false in any material respect;

(b) the Borrowers fail to make any payment due under this Agreement or any Loan Document when due;

(c) the Borrowers breach any covenant set forth in Section 2.8, 5.1.1, 5.1.2, 5.1.5, 5.1.6, 5.1.7, 5.1.8, or 5.2 of this Agreement;

(d) the Borrowers breach any covenant (other than any covenant described in the foregoing clause (c)) made in, or Obligation arising under, any Loan Document, which breach is not remedied to Lender's satisfaction within ten (10) days' notice thereof;

(e) any material misrepresentation or misstatement of fact in any communication, whether written or oral, from the Borrowers to Lender which forms part of the basis for extending credit to the Borrowers;

(f) any material adverse change in the assets, liabilities, financial condition, business, or prospects of the Borrowers occurring after the Effective Date;

(g) any event of default under any Loan Document or any other agreement or loan documents between the Lender and the Borrowers (whether or not such other agreement relates to this Agreement) not cured within any applicable grace period;

(h) except as occasioned by the filing of the Chapter 11 Cases and obligations with respect to which the Bankruptcy Code prohibits Borrowers from complying, or permits Borrowers not to comply, any other default by the Borrowers with respect to its obligations to any other creditors;

(i) Borrowers deny or contest the validity or enforceability of any Loan Documents or obligations of Borrowers in respect of the Loans evidenced hereby;

(j) any Loan Document ceases to be in full force or effect for any reason (other than a waiver or release by Lender);

(k) any judgment entered against Borrowers after the commencement of the Chapter 11 Cases or any order entered in the Chapter 11 Cases which would operate to divest Borrowers of any material assets, except to the extent agreed to by Lender;

(l) the dismissal or conversion of the Chapter 11 Cases (or the filing of any document by Borrowers seeking, or otherwise consenting to or supporting, the foregoing) or the appointment of a trustee in the Chapter 11 Cases;

(m) any action is commenced in the Chapter 11 Cases against the Lender by the Borrowers or any party acting on behalf of their bankruptcy estates, or any proceeds of the Loans are used to investigate claims against the Lender;

(n) any payment of Pre-Petition Debt other than (i) payments made in accordance with the Approved Budget, or (ii) other payments approved by the Bankruptcy Court that are acceptable to Lender;

(o) entry of an order amending, supplementing, staying, vacating or otherwise modifying the Financing Order without the written consent of Lender (or the filing of any pleading by Borrowers seeking, or otherwise consenting to or supporting, any of the foregoing), or Borrowers shall fail to comply with the Financing Order;

(p) the CRO is replaced by any officer unacceptable to the Lender;

(q) there is any change in control of the Borrowers;

(r) the Final Order is not entered within twenty (20) days after entry of the Interim Order;

(s) the Borrowers fail to achieve any of the benchmarks set forth in Article 5 of the APA or the Purchaser terminates the APA; and

(t) the entry of an order or orders in the Chapter 11 Cases confirming a plan or plans of reorganization that do not contain a provision for termination of the commitments of Lender hereunder and repayment in full in cash of all of the Obligations on or before the effective date of such plan.

6.2     <u>Remedies Upon Default</u>. Immediately upon the occurrence and during the continuance of any Event of Default hereunder or under the Loan Documents, and at any time thereafter, and without limiting any other remedy Lender may have: (a) Lender may, at its option and without notice, cease making Loans and declare all amounts outstanding under this Agreement and all other Obligations of Borrowers to Lender to be immediately due and payable; (b) Lender may, at its option and without notice, freeze any deposit accounts with Lender, including returning pending debits or drafts unpaid; (c) Lender may exercise all rights available to it under any Loan Documents or applicable law, including its right to setoff any accounts, deposits, balances, or credits of Borrowers, provided that such rights are not stayed under section 362 of the Bankruptcy Code; and (d) to the extent that any of Lender's exercise of rights under any Loan Documents is stayed under section 362 of the Bankruptcy Code, Lender may seek expedited or emergency relief from such stay in order to promptly exercise its rights.

<u>SECTION 7. MISCELLANEOUS.</u>

7.1     <u>Release</u>. Each of the Borrowers, on behalf of their directors, officers, shareholders, employees, heirs, successors, and assigns (collectively, the "<u>Releasors</u>"), in consideration of the accommodations granted to the Borrowers pursuant to this Agreement, hereby release, remise and forever acquit the Lender, its affiliated entities, subsidiaries, and each of their respective officers, directors, principals, attorneys, successors, and assigns (collectively, "<u>Releasees</u>") from any and all claims, debts, demands, actions, causes of action, contracts, agreements, promises, doings, omissions, damages, and suits at law or in equity however arising, whether known or unknown, and whether now existing or hereafter arising from the state of facts as they now exist.

For further clarity, the Releasors hereby acknowledge and agree that as significant consideration for this Agreement, the terms agreed to by the Lender are of material significance to each of the Borrowers and substantially improves the financial prospects of the Borrowers and that the general release hereby afforded the Releasees is therefore supported by sufficient consideration.  The Releasors acknowledge and agree that the general release hereby afforded the Releasees shall remain fully effective notwithstanding the Releasors' failure to fully benefit from the accommodations granted by the Lender hereby, whether such failure to benefit is due to the Borrowers Parties' subsequent default under this Agreement or due to circumstances unrelated to the Borrowers' relationship with the Lender or otherwise.  The Releasors acknowledge and accept the risk that they are hereby surrendering claims of which they are unaware.  The Releasors acknowledge that it is the intent of the Parties that upon execution and delivery hereof, the Releasees shall have no liability of any kind to the Releasors and the Releasors shall have no

defense or offset to any liability owed to the Lender.  The Releasees shall not be deemed to have released the Releasors by acceptance of this Release.  The Releasees hereby expressly reserve and preserve any and all claims against the Releasors.

7.2     No Waiver; Cumulative Remedies.  No failure to exercise and no delay in exercising, on the part of Lender, any right, power or privilege hereunder, shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein provided are cumulative and not exclusive of any rights or remedies provided by law.

7.3     Successors.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors, heirs, and assigns, including any chapter 7 or chapter 11 trustee appointed in the Chapter 11 Cases. Borrowers shall not assign its obligations under this Agreement or any other Loan Document without Lender's express prior written consent.  Lender shall be entitled to freely assign its rights and obligations hereunder to any other person.

7.4     Governing Law; Jurisdiction.

7.4.1   Governing Law. ALL MATTERS ARISING OUT OF, IN CONNECTION WITH OR RELATING TO THIS AGREEMENT AND THE LOAN DOCUMENTS, INCLUDING, WITHOUT LIMITATION, ITS VALIDITY, INTERPRETATION, CONSTRUCTION, PERFORMANCE, AND ENFORCEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF MAINE, WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES, AND ANY APPLICABLE LAWS OF THE UNITED STATES OF AMERICA (INCLUDING THE BANKRUPTCY CODE).

7.4.2   Submission to Jurisdiction.  BORROWERS HEREBY CONSENT AND AGREE THAT THE BANKRUPTCY COURT SHALL HAVE EXCLUSIVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN THE PARTIES PERTAINING TO THIS AGREEMENT OR TO ANY MATTER ARISING OUT OF OR RELATING TO THIS AGREEMENT; PROVIDED, HOWEVER, THAT THE PARTIES ACKNOWLEDGE THAT ANY APPEALS FROM THE BANKRUPTCY COURT MAY HAVE TO BE HEARD BY A COURT OTHER THAN THE BANKRUPTCY COURT; PROVIDED, FURTHER, THAT NOTHING IN THIS AGREEMENT SHALL BE DEEMED OR OPERATE TO PRECLUDE LENDER FROM BRINGING SUIT OR TAKING OTHER ACTIONS.

7.5     Notice.  Except as otherwise provided herein, any notice, demand, request, consent, approval, declaration, service of process or other communication that is required, contemplated, or permitted under the Loan Documents or with respect to the subject matter hereof shall be in writing, and shall be deemed to have been validly served, given, delivered, and received upon the earlier of:  (a) the day of transmission by electronic mail or hand delivery; (b) one day following transmission by an overnight express service or overnight mail delivery service; or (c) the third Business Day after deposit in the U.S. Mail, with proper first class postage prepaid, in each case addressed to the party to be notified as set forth in **Exhibit C** (or to such other address as each party may designate for itself by like notice).

7.6     Surety Defenses Waived. The Borrowers hereby waive demand, notice and protest, and waive all recourse to suretyship and guarantorship defenses generally, including but not limited to, any extensions or postponements of time for payment or performance which may be granted to the Borrowers, any modifications or amendments to this Agreement or any document securing payment and performance hereof, any act or omission to act by or on behalf of Lender, any substitution, exchange, or release of security, and all other indulgences of any type which may be granted by Lender to the Borrowers or any other party liable herefor, including any or all additions or releases of any other parties primarily or secondarily liable herefor.  All of the foregoing promises shall bind Borrowers together with their respective heirs, personal representatives, successors and assigns, jointly and severally.

7.7     Savings Clause. All agreements between the Parties are hereby expressly limited so that in no contingency or event whatsoever, whether by reason of acceleration of maturity of the Obligations or otherwise, shall the amount paid or agreed to be paid to Lender for the use or the forbearance of the Obligations exceed the maximum permissible under applicable law. As used herein, the term "applicable law" shall mean the law in effect as of the date hereof provided, however, that in the event there is a change in the law which results in a higher permissible rate of interest, then this Agreement shall be governed by such new law as of its effective date. In this regard, it is expressly agreed that it is the intent of the Parties in the execution, delivery and acceptance of this Agreement to contract in strict compliance with the laws of the State of New Hampshire from time to time in effect. If, under or from any circumstances whatsoever, fulfillment of any provision hereof or of any of the Loan Documents at the time of performance of such provision shall be due, shall involve transcending the limit of such validity prescribed by applicable law, then the obligation to be fulfilled shall automatically be reduced to the limits of such validity, and if under or from circumstances whatsoever Lender should ever receive as interest an amount which would exceed the highest lawful rate, such amount which would be excessive interest shall be applied to the reduction of the principal balance evidenced hereby and not to the payment of interest. This provision shall control every other provision of all agreements between the Parties.

7.8     Waiver of Jury Trial. THE PARTIES MUTUALLY HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVE THE RIGHT TO A TRIAL BY JURY IN RESPECT OF ANY CLAIM BASED HEREON, ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER LOAN DOCUMENTS OR ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY, INCLUDING, WITHOUT LIMITATION, ANY COURSE OF CONDUCT, COURSE OF DEALINGS, STATEMENTS OR ACTIONS OF LENDER RELATING TO THE ADMINISTRATION OF THE LOAN OR ENFORCEMENT OF THE LOAN DOCUMENTS, AND AGREE THAT NEITHER PARTY WILL SEEK TO CONSOLIDATE ANY SUCH ACTION WITH ANY OTHER ACTION IN WHICH A JURY TRAIL CANNOT BE OR HAS NOT BEEN WAIVED. EXCEPT AS PROHIBITED BY LAW, BORROWERS HEREBY WAIVE ANY RIGHT THEY MAY HAVE TO CLAIM OR RECOVER IN ANY LITIGATION ANY SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES OR ANY DAMAGES OTHER THAN, OR IN ADDITION TO, ACTUAL DAMAGES. BORROWERS CERTIFY THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF LENDER HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT LENDER WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE

FOREGOING WAIVER. THIS WAIVER CONSTITUTES A MATERIAL INDUCEMENT FOR LENDER TO ACCEPT THIS AGREEMENT AND MAKE THE LOAN.

7.9     <u>Integration</u>. This Agreement is intended by the parties as the final, complete and exclusive statement of the transactions evidenced by this Agreement. All prior or contemporaneous promises, agreements and understandings, whether oral or written, are deemed to be superseded by this Agreement, and no party is relying on any promise, agreement or understanding not set forth in this Agreement. This Agreement may not be amended or modified except by a written instrument describing such amendment or modification executed by each of the Parties.

7.10     <u>No Third Party Beneficiaries</u>.  No provisions of the Loan Documents are intended, nor will be interpreted, to provide or create any third-party beneficiary rights or any other rights of any kind in any person other than the Parties except as otherwise specifically provided herein, and, except as otherwise so provided, all provisions of the Loan Documents will be personal and solely between the Parties.

7.11     <u>Counterparts</u>.  This Agreement and any amendments, waivers, consents or supplements hereto may be executed originally or by transmittal of an electronic file (included a PDF) in any number of counterparts, and by different parties hereto in separate counterparts, each of which when so delivered shall be deemed an original, but all of which counterparts shall constitute but one and the same instrument.

7.12     <u>Severability</u>.  Whenever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under such law, such provision shall be ineffective only to the extent and duration of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

7.13     <u>Notice of Maine Law</u>.  Under Maine law, no promise, contract, or agreement to lend money, extend credit, forbear from collection of a debt, or make any other accommodation for the repayment of a debt for more than $250,000 is enforceable unless the promise, contract, or agreement is in writing and signed by a duly authorized person acting on behalf of the lender.  In connection with this Agreement and any other transactions relating to this Agreement or other obligations, the Borrowers understand and agree that any such promise, contract, or agreement, whether presently in existence or arising in the future, must be in writing and properly signed by the Lender in order to be binding upon the Lender.

*[Remainder of Page Intentionally Blank]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above.

SANCTUARY CARE LLC

By:_____
Name: Alice Katz
Title: Chief Restructuring Officer


SANCTUARY AT RYE OPERATIONS LLC

By:_____
Name: Alice Katz
Title: Chief Restructuring Officer


CAMDEN NATIONAL BANK


By:_____
Name:
Title:

Exhibit A to the Credit Agreement

Form of Loan Request

**LOAN DISBURSEMENT REQUEST**

BORROWERS:  Sanctuary Care LLC
Sanctuary at Rye Operations LLC
120 Buckminster Way
Portsmouth, NH 03801

LENDER:  Camden National Bank
178 Court Street, Suite 300
Auburn, ME 04210

Loan Type.  This Loan is made subject to the terms and conditions of that certain DIP Credit Agreement dated April ___, 2017 (the "Agreement'). Unless otherwise defined herein, all capitalized terms shall have the meaning ascribed to them in the Agreement. The purpose of this Loan to the Borrowers is only to fund Shortfalls during the Budget Period, pursuant to the Approved Budget. The Loan proceeds may not be used for any other purpose without written consent of Lender, which may be withheld in its sole discretion.

Disbursement. Borrower acknowledges that no loan proceeds will be disbursed until all terms and conditions of the Agreement have been satisfied. Please disburse the **$0.00** in loan proceeds pursuant to the terms of the Agreement.

Representations.  By signing this Request, Borrowers represent and warrant to Lender that the information provided herein and the covenants, representations, and warranties in the Agreement are true and correct and that there has been no material adverse change in Borrowers' financial condition as previously disclosed by the Borrowers to Lender. Borrowers have delivered a copy of this Request to the parties identified in Exhibit C of the Agreement.

This Request is dated _____.

Borrowers:

SANCTUARY CARE LLC                    SANCTUARY AT RYE OPERATIONS LLC

By:_____     By:_____
Name: Alice Katz                        Name: Alice Katz
Title: Chief Restructuring Officer       Title: Chief Restructuring Officer

Exhibit B to the Credit Agreement

<u>Loan Documents</u>

(1) <u>Promissory Note</u>

<u>Exhibit C to the Credit Agreement</u>

<u>Notice Information</u>

<u>If to the Borrowers</u>:
Sanctuary Care LLC & Sanctuary at Rye Operations LLC
Attn. Alice Katz, CRO
120 Buckminster Way
Portsmouth, NH 03801
E-mail: aktaz@thevincagroup.com

<u>With copies to</u>:
Peter Tamposi
The Tamposi Law Group
159 Main St.
Nashua, NH 03060
E-mail: peter@thetamposilawgroup.com

<u>If to the Lender</u>:
Camden National Bank
Attn. Kregg Jarvais and Alvin Butler
178 Court Street, Suite 300
Auburn, ME 04210
E-mail: kjarvais@camdennational.com
          abutler@camdennational.com

<u>With copies to</u>:
Jeremy R. Fischer
Benjamin E. Marcus
Drummond Woodsum
84 Marginal Way, Suite 600
Portland, ME 04101
E-mail: jfischer@dwmlaw.com
          bmarcus@dwmlaw.com

<u>If to the U.S. Trustee</u>:
Office of United States Trustee, Region 1
Attn. Geraldine L. Karonis
1000 Elm Street, Suite 605
Manchester, NH 03101
E-mail: geraldine.l.karonis@usdoj.gov

Exhibit D to the Credit Agreement

Permitted Indebtedness

## **EXHIBIT B**

Approved Budget